**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ROYAL KENNETH HAYES,
            *Petitioner-Appellant,*

v.

ROBERT L. AYERS, of San Quentin
State Prison,
            *Respondent-Appellee.*

No. 07-99014

D.C. No.
3:01-cv-03926-MHP

OPINION

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, District Judge, Presiding

Argued and Submitted
March 11, 2010—San Francisco, California

Filed January 7, 2011

Before: Betty B. Fletcher, Richard R. Clifton, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Clifton;
Dissent by Judge B. Fletcher

491

## COUNSEL

Eric S. Multhaup, Mill Valley, California, for the appellant.

Lloyd G. Carter, Deputy Attorney General, Fresno, California, for the appellee.

## OPINION

CLIFTON, Circuit Judge:

Royal Kenneth Hayes was convicted and sentenced to death by a California state court for the 1981 murders of Lauren de Laet and Donald MacVicar. On appeal from the district court's denial of his habeas corpus petition, he presents eight claims of error, all related to the guilt phase of his trial. The claims concern (1) the trial court's denial of his motion for change of venue based on alleged adverse pretrial publicity; (2) the admission of hearsay evidence regarding a firearms conviction of the man who allegedly delivered the murder weapon to Hayes; (3) the trial court's refusal to declare a mistrial following a statement by a witness during her testimony that she had heard that Hayes had offered $25,000 to have her killed; (4) the trial court's refusal to permit Hayes to call the attorney of another witness to testify about communications he had with his client that allegedly would have impeached her testimony; (5) the prosecutor's alleged failure to correct false testimony by that same witness; (6) security measures taken during the trial; (7) the eleven years that passed between Hayes's conviction and the filing of his opening brief on direct appeal to the California Supreme Court; and (8) the alleged cumulative prejudice of the above errors. We affirm the district court's denial of all of his claims.

## I.   Background

In December of 1981, Donald MacVicar and Lauren de Laet sought to buy cocaine from Hayes. In the presence of de Laet and Diane Weller, one of Hayes's accomplices who later

testified against him, MacVicar gave Hayes $160,000 in cash towards a $250,000 payment for cocaine. Hayes was to deliver the cocaine in a secluded location in Santa Cruz, California. Weller testified that Hayes told her separately that she was to accompany him to Santa Cruz to kill MacVicar and de Laet.

Two days later, on December 29, 1981, Hayes, Weller, MacVicar, and de Laet drove to Santa Cruz, where they met Debbie Garcia at a doughnut shop. The group got into Garcia's car and drove to an isolated area in the woods, near two shallow holes that Garcia had dug earlier at Hayes's request. Garcia, who disavowed any advance knowledge of Hayes's plan to kill MacVicar and de Laet, claimed that Hayes told her the holes would be used to hide packages, as they had used similar holes in the past.

According to testimony by Weller and Garcia, Hayes then instructed Weller to wait in the car with MacVicar and de Laet. He walked into the woods with Garcia, purportedly to "check out" the exact location where the cocaine would be exchanged. Garcia returned about ten minutes later to retrieve MacVicar, whom she led to where Hayes was waiting. Hayes told Garcia to frisk MacVicar. As MacVicar leaned against a tree to be searched, Hayes killed him with a single shot to the back of his head. Garcia then retrieved de Laet from the car, and Hayes shot her twice in the head, killing her.

Nearly two months later, a mushroom hunter discovered fragments of what later turned out to be de Laet's skull, and law enforcement began to investigate. On March 18, 1982, Garcia, fearing for her life and for the safety of her family, informed police about the murders, including the involvement of Hayes, Weller, and herself. Hayes was arrested and charged with murder.

After lengthy pretrial proceedings, including an unsuccessful motion by Hayes for a change of venue, Hayes went to

trial in Santa Cruz County on December 3, 1984. Garcia and Weller received immunity for testifying against Hayes. The jury ultimately convicted Hayes of the first-degree murders of MacVicar and de Laet, and also of false imprisonment, assault with a deadly weapon, and possession of cocaine based on separate conduct before his arrest. It found true a multiple-murder special-circumstance allegation and an allegation that Hayes had personally used a firearm to commit the murders. The jury was unable to agree on a penalty for the murder convictions.

Hayes again moved for a change of venue, and the case was transferred to Stanislaus County for retrial of the penalty phase. On May 29, 1986, a jury returned a penalty verdict of death, and the court entered judgment on August 8, 1986.

On direct appeal, the California Supreme Court affirmed the judgment against Hayes in a published decision filed on December 23, 1999. *People v. Hayes*, 21 Cal. 4th 1211 (Cal. 1999). While this direct appeal was pending, Hayes filed a petition for a writ of habeas corpus in the California Supreme Court, which the court denied on the merits without further explanation. The United States Supreme Court denied Hayes's petition for certiorari. *Hayes v. California*, 531 U.S. 980 (2000).

Hayes then filed a timely petition for writ of habeas corpus under 28 U.S.C. § 2254 in the Northern District of California. The district court granted summary judgment for the respondent on all of the claims in Hayes's petition and entered judgment denying the petition on June 5, 2007. Hayes timely filed this appeal.

## II.  Discussion

Hayes raises eight claims of error related to the guilt phase of his trial. As Hayes filed his habeas petition in 2001, the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA) governs Hayes's habeas petition, *see Woodford v. Garceau*, 538 U.S. 202, 210 (2003), and we review the denial of his petition de novo. *Tilcock v. Budge*, 538 F.3d 1138, 1143 (9th Cir. 2008). Under AEDPA, a petition challenging a state court conviction will not be granted unless the decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). We measure each of Hayes's claims against this standard.

### A.    Denial of Change of Venue

Hayes first argues that the guilt phase of his trial should have been moved out of Santa Cruz County because of adverse pretrial publicity. He contends that the state court's denial of his change of venue motion in the face of prejudicial media coverage denied him due process in contravention of clearly established Supreme Court precedent.

Hayes initially moved for change of venue on February 25, 1983. He submitted evidence of media coverage of his case in Santa Cruz County. The *Santa Cruz Sentinel* ran 37 articles about the case between February 1982, when the remains of the victims were first found, and early January 1983, when Hayes pleaded not guilty. The *San Jose Mercury-News* published 30 articles about the case in that time. Other Northern California newspapers and television and radio stations also covered the investigation and eventual criminal proceedings. The media coverage included descriptions of the victims' remains as they were found; Hayes's criminal history in Oregon and Minnesota, including the fact that he had been twice acquitted of murder (once because he was found not guilty by reason of insanity); Hayes's commitment to and escape from a mental hospital; Garcia and Weller's descriptions of how Hayes shot MacVicar and de Laet and removed their heads and hands; and the fact that Weller passed a polygraph test.

The trial court denied Hayes's motion without prejudice in March of 1983, noting that the anticipated delay before his

trial would diminish the likelihood that he would be unable to receive a fair trial in Santa Cruz County.

Hayes renewed and supplemented his change-of-venue motion four times after voir dire began in August of 1984. Each time, he documented additional press coverage since his previous filing. The supplementary materials included articles decrying the cost and inefficiency of the Hayes trial and that of another murder defendant, David Carpenter ("The Trailside Killer"), whose trial had recently been moved out of Santa Cruz County, and coverage of Hayes's jailhouse marriage to a former nun. The court finally denied Hayes's renewed motion on December 3, 1984, shortly before the prosecution commenced its case-in-chief.

**[1]** The Sixth and Fourteenth Amendments "guarantee[ ] to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). When a trial court is "unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere[,] . . . due process requires that the trial court grant defendant's motion for a change of venue." *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir. 1988) (citing *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963)).

**[2]** In this circuit, we have identified "two different types of prejudice in support of a motion to transfer venue: presumed or actual." *United States v. Sherwood*, 98 F.3d 402, 410 (9th Cir. 1996). Interference with a defendant's fair-trial right "is presumed when the record demonstrates that the community where the trial was held was saturated with prejudicial and inflammatory media publicity about the crime." *Harris*, 885 F.2d at 1361. Actual prejudice, on the other hand, exists when voir dire reveals that the jury pool harbors "actual partiality or hostility [against the defendant] that [cannot] be laid aside." *Id.* at 1363. The Supreme Court applied this two-pronged analytical approach in a case it decided at the end of its last term. *See Skilling v. United States*, 561 U.S. __ , 130

S. Ct. 2896, 2907 (2010) (considering, first, whether pretrial publicity and community hostility established a presumption of juror prejudice, and then whether actual bias infected the jury).

*Skilling* illuminates and synthesizes the earlier Supreme Court decisions upon which Hayes relies. It makes plain that neither presumed prejudice nor actual prejudice arising from news coverage and popular sentiment in Santa Cruz County entitled Hayes to a change of venue.

### 1. Presumptive Prejudice

**[3]** "A presumption of prejudice" because of adverse press coverage "attends only the extreme case." *Skilling*, 130 S. Ct. at 2915; *see also Harris*, 885 F.2d at 1361 ("The presumed prejudice principle is rarely applicable and is reserved for an extreme situation." (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976)) (citation and internal quotation marks omitted)). The doctrine of presumed prejudice is the product of three Supreme Court decisions from the 1960's: *Rideau v. Louisiana*, 373 U.S. 723 (1963), *Estes v. Texas*, 381 U.S. 532 (1965), and *Sheppard v. Maxwell*, 384 U.S. 333 (1966). *See Skilling*, 130 S. Ct. at 2913-15.

**[4]** Two of these three precedents, *Estes* and *Sheppard*, have little application here because they concern instances where the media significantly interfered with the trial itself. *See id.* at 2915 n.14 (indicating that reliance on *Estes* and *Sheppard* is "misplaced" where news coverage did not influence the jury after it was empaneled, because "those cases involved media interference with courtroom proceedings *during* trial."). In *Sheppard*, the denial of due process arose in significant part from the "carnival atmosphere" that the press created at trial. *See Sheppard*, 384 U.S. at 358; *see also id.* at 355 ("[B]edlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom."). Pretrial news coverage alone did not infringe upon Sheppard's

due process rights, despite "months [of] virulent publicity." *Skilling*, 130 S. Ct. at 2914 (citing *Sheppard*, 384 U.S. at 354) (alternation in original). Similarly, in *Estes*, "the media's overzealous reporting efforts . . . 'led to considerable disruption' and denied the 'judicial serenity and calm to which [Billie Sol Estes] was entitled.' " *Id.* (quoting *Estes*, 381 U.S. at 536) (alteration in original).

**[5]** In this case, by contrast, all of the news coverage that Hayes marshaled in support of his change of venue motion occurred before the jury was empaneled. Hayes did not allege any significant disruption of his trial proceedings by the media. He did file a motion to reopen voir dire days after the jury was empaneled because of two newspaper articles covering the opening days of the prosecution's case. But he never suggested that these two articles—primarily factual accounts of the trial's commencement—had any effect on the jury or the proceedings. They certainly did not approach the level of disruption that supported a presumption of prejudice in *Estes* and *Sheppard*.

*Rideau* leaves open the possibility of presumptive prejudice based exclusively on pretrial publicity, but that case is entirely distinguishable from what happened here. Wilbert Rideau robbed a bank in a small Louisiana town, kidnaped three bank employees, and killed one of them. *Rideau*, 373 U.S. at 723-24. Without Rideau's knowledge or consent, and without counsel present, police filmed an interrogation of Rideau in which he confessed. *Id.* at 724. The filmed confession was broadcast on television three times, within weeks of Rideau's trial, to audiences ranging in size from 24,000 to 53,000 people. *Id.* The parish from which Rideau's jury was drawn had a total population of about 150,000 people. *Id.* Rideau was convicted after the trial court denied his change-of-venue motion, but the Supreme Court reversed. The Court concluded that, "to the tens of thousands of people who saw and heard" Rideau "personally confessing in detail to the crimes with which he was later to be charged," the interrogation "in a very

real sense was Rideau's trial—at which he pleaded guilty to murder." *Id.* at 726. Deeming the proceedings that followed "a hollow formality" under the circumstances, *id.*, the Court reversed "without pausing to examine a particularized transcript of the voir dire examination of the members of the jury." *Id.* at 727.

**[6]** While the small size of Santa Cruz County (about 190,000 people at the time of Hayes's motion) weighs in Hayes's favor, *see Skilling*, 130 S. Ct. at 2915, the press coverage at issue in this case did not include "the kind of vivid, unforgettable information" that viewers of Rideau's confession were exposed to. *Id.* at 2916. Although the stories about Hayes were unflattering and in some instances included inadmissible evidence, "they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Id.* at 2916. "No evidence of the smoking-gun variety invited prejudgment of his culpability." *Id.*

**[7]** Moreover, the publicity Hayes complains of did not immediately precede his trial as the television broadcasts did in *Rideau*. The Supreme Court has repeatedly recognized that the passage of significant time between adverse press coverage and a defendant's trial can have "a profound effect on the community and, more important, on the jury, in softening or effacing opinion." *Patton v. Yount*, 467 U.S. 1025, 1033 (1984) (change of venue not constitutionally required where "extensive adverse publicity and the community's sense of outrage were at their height" four years before the defendant's trial); *see also Skilling*, 130 S. Ct. at 2916 (no presumed prejudice where "the decibel level of media attention diminished somewhat" in the four years between Enron's bankruptcy and former executive Jeffrey Skilling's trial).

*Patton v. Yount* involved circumstances closer to those in this case. The publicity and potential for prejudice in that case were at least as great as they were in this case, yet the

Supreme Court rejected Yount's claim that his right to a fair trial had been violated. Yount was tried and convicted of first degree murder for killing an 18 year-old female high school student. That conviction was set aside by the state supreme court on the ground that he had not been given proper notice of his right to an attorney under *Miranda v. Arizona*, 384 U.S. 436 (1966), and his case was remanded for a new trial. Press coverage reported not only the facts of the crime but also Yount's prior confession, his prior plea of temporary insanity, and his conviction for the very same murder. *Id.* at 1029. That coverage was at least as prejudicial as the reports of Hayes's previous trials and acquittals that were publicized in this case. Yet publicity even of an inadmissible prior conviction was held not to foreclose a fair trial in *Yount*.

The Court reached that conclusion even while noting that all but 2 of 163 members of the venire panel for Yount's trial who were questioned acknowledged that they had heard about the case, and that 126 of them (77%) admitted that they would carry an opinion into the jury box based on pre-existing knowledge of the case. *Id.* Hayes has not established that the publicity preceding his trial had a greater negative impact than that held in *Yount* to be insufficient to establish a violation of due process.

**[8]** The judge who presided over Hayes's trial concluded that he was satisfied with jurors' "statements regarding either the limited amount of publicity that they have been exposed to or the fact that they will disregard it." As the district court found, "few who did recall the initial publicity remembered anything other than nonprejudicial facts . . . and few were aware of Petitioner's prior homicide acquittals." The bulk of the publicity Hayes points to occurred between February of 1982 and January of 1983, about two years before Hayes's jury was selected in late 1984. That period of time was not as long as the four-year periods that passed in both *Skilling* and *Yount*, but the two years was apparently long enough for the impact of the initial press coverage to dissipate.

The trial judge based his preliminary denial of Hayes's change-of-venue motion on his perception that the considerable delay before Hayes's trial would allow time for community sentiment to cool to the point that a fair trial would be possible. "When pretrial publicity is at issue, 'primary reliance on the judgment of the trial court makes [especially] good sense' because the judge 'sits in the locale where the publicity is said to have had its effect' and may base her evaluation on her 'own perception of the depth and extent of news stories that might influence a juror.' " *Skilling*, 130 S. Ct. at 2918 (quoting *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)) (alternation in original).

**[9]** The press coverage in this case cannot be characterized as a " 'barrage of inflammatory publicity immediately prior to trial,' amounting to a 'huge . . . wave of public passion' " against Hayes. *Patton*, 467 U.S. at 1033 (quoting *Murphy v. Florida*, 421 U.S. 794, 798 (1975) and *Irvin*, 366 U.S. at 728). The pretrial media attention alone cannot justify a presumption of prejudice in this case.

### 2.  *Actual Prejudice*

**[10]** Where circumstances are not so extreme as to warrant a presumption of prejudice, we must still consider whether publicity and community outrage resulted in a jury that was actually prejudiced against the defendant. This inquiry focuses on the nature and extent of the voir dire examination and prospective jurors' responses to it. *See Skilling*, 130 S. Ct. at 2917-23. Our task is to "determine if the jurors demonstrated actual partiality or hostility [toward the defendant] that could not be laid aside." *Harris*, 885 F.2d at 1363.

**[11]** Voir dire examination in this case was extensive, occurring over a period of more than two months and filling over 5000 pages of reporter's transcripts. It revealed no bias even approaching a level that would require a change of venue under the Supreme Court's decisions. By Hayes's own

calculation, 35 of 277 prospective jurors (13%) were excused because of their knowledge of pretrial publicity. In *Murphy v. Florida*, however, the excusal of 20 of 78 veniremen (26%) for having prejudged the defendant's guilt—a clearer demonstration of partiality than mere knowledge of publicity—did not "suggest[ ] a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own." 421 U.S. 794, 803 (1975).

By Hayes's count, 42 of 78 ultimately "qualified" jurors had some degree of familiarity with the pretrial press coverage. But "[p]rominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 130 S. Ct. at 2914-15 (citing *Irvin*, 366 U.S. at 722). Our review of the voir dire record confirms the California Supreme Court's impression that

> [f]ew prospective jurors who did recall the initial publicity remembered anything other than the fact that the bodies had been found on the campus of the university. Few were aware from media reports of the potentially prejudicial and inadmissible evidence regarding appellant's acquittal of the prior Minnesota murder charge or of the not guilty by reason of insanity verdict in the prior Oregon prosecution.

*Hayes*, 21 Cal. 4th at 1251.

Even where a prospective juror displays some prior knowledge of the facts and issues involved in a case, it is his ability to "lay aside his impression or opinion and render a verdict based on the evidence presented in court" that is crucial. *Irvin*, 366 U.S. at 723. We may give "little weight," *id.* at 728, to a prospective juror's assurances of impartiality "where the general atmosphere in the community or courtroom is sufficiently inflammatory." *Murphy*, 421 U.S. at 802. But, as explained above, the circumstances surrounding Hayes's trial were "not at all of that variety." *Id.* Voir dire confirmed that

the "largely factual" news coverage in this case was mostly forgotten, or disregarded, by the time Hayes's jury was selected. *See id.*

This case is "worlds apart" from *Irvin*, where actual prejudice mandated a change of venue. *See Skilling*, 130 S. Ct. at 2921. The "barrage" of publicity "unleashed against [the defendant]" in *Irvin* was described in *Skilling* as having included "reports of his confessions to the slayings and robberies . . . delivered regularly to 95% of the dwellings in the county where the trial occurred, which had a population of only 30,000." *Id.* at 2921-22 (internal quotation marks omitted). In *Irvin*:

> the pattern of deep and bitter prejudice in the community was clearly reflected in the sum total of the voir dire: 370 prospective jurors or almost 90% of those examined on the point . . . entertained some opinion as to guilt, and 8 out of the 12 jurors thought Irvin was guilty.

*Skilling*, 130 S. Ct. at 2922 (quoting *Irvin*, 366 U.S. at 727) (internal quotation marks and alterations omitted). There is no evidence here that any member of the empaneled jury was influenced by press coverage, let alone convinced by it that Hayes was guilty.

**[12]** "Reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality, for that judge's appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record." *Skilling*, 130 S. Ct. at 2918. In denying Hayes's change-of-venue motion, the trial court said:

> Because of the manner in which the jury was selected, the fact that individual jurors were examined separately, I feel that a lot of information which might have poisoned the panel has never developed.

> With regard to each of the jurors that has been passed for cause by the court, I am convinced that they are and will be fair jurors and not people who would decide a case based upon public feeling or pretrial publicity. Some of them do know something about the case because of pretrial publicity, but I'm convinced that their statements regarding either the limited amount of publicity that they have been exposed to or the fact that they will disregard it and it has not in any way caused them to form any opinions is sufficient demonstration of the fact that the defendant can have a fair trial.

The record gives us no basis to second-guess the trial court's better-positioned assessment. Because Hayes suffered no presumed or actual prejudice compelling a change of venue, relief on this claim was properly denied.

### B. Hearsay Evidence of Larry Dahl's Firearms Convictions

Hayes's next claim challenges the manner in which the prosecution sought to prove that Larry Dahl, the man who allegedly delivered the murder weapon to Hayes, was convicted of firearms offenses. According to Weller, Hayes requested a gun and silencer to use in the murders from an associate in Minnesota, Jim Johnson. Johnson arranged for Larry Dahl to deliver the weapon from Minnesota to California. After this plot unraveled, Dahl was convicted on federal charges in Minnesota for his role in transporting the weapon across state lines.

Hayes argues that the prosecution improperly introduced hearsay evidence of Dahl's firearms convictions to bolster prosecution witness Diane Weller's credibility and to insinuate Hayes's guilt. He contends that this deprived him of his "federal rights of due process and his right of confrontation," as purportedly established by the Supreme Court in *Bruton v.*

*United States*, 391 U.S. 123 (1968), and *Gray v. Maryland*, 523 U.S. 185 (1998).[1]

According to Hayes, the prosecution attempted to paint Weller as credible in front of the jury by connecting the fact that she testified against Dahl in a separate proceeding with the fact that he was ultimately convicted in that case. The prosecution elicited the following exchange with Weller on direct examination:

Q:   And you testified against Mr. Dahl in Minnesota while he was on charges of numerous things concerning guns; is that correct?

A:   Yes.

Q:   And in that testimony in Minnesota, did you tell the true story there?

A:   Yes I did.

. . .

Q:   Are you telling a true story here?

A:   Yes I am.

On redirect examination, the prosecution linked Weller's supposed truth telling in Dahl's trial to his eventual conviction:

---

[1]Hayes also argues that evidence of Dahl's firearms convictions somehow undermined the defense's theory that Dahl killed MacVicar and de Laet after driving the weapon from Minnesota to California. We reject this argument because Dahl's convictions for possessing and transporting a firearm did not imply that Dahl delivered the gun to Hayes instead of using it, as the defense maintained he did, to commit the murders himself. Dahl's convictions are equally consistent with the defense's theory.

Q:   You testified against Mr. Dahl in Federal
     Court?

A:   Yes I did.

Q:   Mr. Dahl is charged with transporting the very
     firearms that we are talking about [in this case]
     across state lines?

A:   That's right.

Q    As well as being an ex-felon in possession of
     firearms?

A:   Yes.

Q:   And you testified at that hearing against Mr.
     Dahl?

A:   Yes I did.

Q:   Mr. Dahl was convicted?

A:   Yes.

Mr. Minsloff:   Objection. Hearsay.

The Court:   Sustained.

[13] Hayes does not clearly explain how these exchanges
violate the Confrontation Clause as interpreted in *Bruton* and
*Gray*. Like the California Supreme Court, we "infer that the
confrontation claim is based on the hearsay nature of the evi-
dence that Dahl had been convicted." *Hayes*, 21 Cal. 4th at
1269. *Bruton* and *Gray* do not, however, stand for the propo-
sition that any hearsay violation violates the Confrontation
Clause. *Bruton* and *Gray* bear almost no resemblance to this

case beyond the incidental detail that hearsay is in some way involved in both instances.

In *Bruton*, two codefendants jointly stood trial for armed robbery. 391 U.S. at 124. The trial court admitted the confession of one codefendant, Evans, that implicated both Evans and Bruton. *Id.* The court instructed the jury not to consider the confession, which was hearsay inadmissible against Bruton, in determining Bruton's guilt. *Id.* at 124-25. The Supreme Court held that, because Evans did not take the stand and was not subject to cross-examination by Bruton, the jury's knowledge of Evans' confession violated Bruton's right of confrontation, despite the limiting instruction. The Court held that *Bruton* presented a "context[ ] in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135. *Gray* extended *Bruton* to a codefendant's confession, under similar joint-trial circumstances, that was "redacted . . . by substituting for the defendant's name in the confession a blank space or the word 'deleted.' " *Gray*, 523 U.S. at 188. The Court held that these redactions made no constitutional difference. *Id.* at 192.

The hearsay involved in this claim arises in a very different context. The hearsay statement at issue here is the evidence of Dahl's convictions, not a statement by any witness that Hayes was unable to cross-examine. Bruton's inability to cross-examine his codefendant was a necessary premise of the Court's holding in that case. *See Bruton*, 391 U.S. at 128 ("Evans' confession added substantial, perhaps even critical, weight to the Government's case *in a form not subject to cross-examination*, since Evans did not take the stand. Petitioner thus was denied his constitutional right of confrontation." (emphasis added)). Hayes does not identify any witness he was denied the opportunity to cross-examine, nor explain what additional cross-examination related to the existence of Dahl's firearm convictions might have accomplished.

*Bruton* and *Gray* are further distinguishable because the trial court here excluded the challenged hearsay, while the confessions in *Bruton* and *Gray* were admitted with instructions that they be considered only as to one codefendant. *See Gray*, 523 U.S. at 189; *Bruton*, 391 U.S. at 124. A central problem in those cases was the practical difficulty of considering evidence for one purpose but ignoring it for another. *Bruton* addressed the "great" risk that a jury could not or would not limit its consideration as instructed under the circumstances of that case, where the consequences of its failure to do so would be "vital" for the nonconfessing codefendant. *Bruton*, 391 U.S. at 135. Hayes does not identify any similar risk here. The complete exclusion of the inadmissible hearsay eased the jurors' task of ignoring it by allowing them to disregard it entirely. Outside of exceptional circumstances such as *Bruton* presented, "juries are presumed to follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 211 (1987), including the routine instruction to disregard inadmissible evidence. Hayes gives us no reason to stray from the ordinary presumption here.

**[14]** In sum, the confrontation right at stake in *Bruton* and *Gray* is not implicated in this case. Hayes fails to identify a witness he was unable to cross-examine, let alone say how he was prejudiced by his inability to cross-examine such a hypothetical witness. The trial court did not admit the challenged hearsay for any purpose, but rather immediately sustained an objection to it. The district court properly denied this claim.

## C.  *Hearsay Evidence of a Murder-for-Hire Plot*

Hayes takes issue with another hearsay violation. The violation occurred when Diane Weller volunteered hearsay evidence that Hayes had offered $25,000 in exchange for her murder. Weller explained, in response to the prosecutor's questions, that she had not revealed the murders of MacVicar and de Laet to law enforcement earlier because she feared

Hayes. She testified to being threatened before she went to jail. Asked who had threatened her, Weller responded:

> I [received threats] at Jim Johnson's apartment in February when Kenny Hayes was there. He threatened to kill me if I ever said anything about what had happened in California. And then when I was at my apartment, I believe a day or two after Jim Johnson was arrested, Sondra Johnson said there was a contract out on me for $25,000 from Kenny Hayes.

Defense counsel immediately lodged a hearsay objection, which the court sustained. The prosecutor maintained that Sondra Johnson's statement about the murder contract was offered not for the truth of the matter asserted, but to prove Weller's reason to fear for her life. The court nonetheless reiterated that the objection was sustained and told the jurors that the statement "should be stricken from [their] minds."

Hayes immediately argued, and now maintains, that Weller's inadmissible reference to the murder-for-hire plot required a mistrial, though the court sustained an objection to the statement and instructed the jury to disregard it. The court's failure to declare a mistrial, he contends, violated his right to due process recognized by the Supreme Court in *Estelle v. McGuire*, 502 U.S. 62 (1991).

**[15]** Due process guarantees "the fundamental elements of fairness in a criminal trial." *McGuire*, 502 U.S. at 70 (quoting *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967)). The *McGuire* Court cautioned, however, that "we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.' " *Id.* at 73 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Id.* (quotation and citation omitted).

**[16]** Hayes identifies no decision—much less a Supreme Court decision, as AEDPA requires—in which hearsay

excluded by the trial court with an instruction to the jury to disregard it was nonetheless deemed prejudicial enough to undermine the fundamental fairness of a criminal trial. The due process claims in *McGuire* concerned (1) the admission at trial of nonhearsay evidence related to battered child syndrome, and (2) a jury instruction that the defendant maintained allowed the jury to consider past acts as evidence of his propensity to commit the crime charged. In any event, *McGuire* held that "neither the introduction of the challenged evidence, nor the jury instruction as to its use, 'so infused the trial with unfairness as to deny due process of law.' " *Id.* at 75 (quoting *Lisenba v. California*, 314 U.S. 219, 228 (1941)). *McGuire* therefore sheds no light on what is required for a witness's volunteered and subsequently excluded hearsay statement to violate due process.

Hayes's reliance on the Seventh Circuit case of *Dudley v. Duckworth*, 854 F.2d 967 (7th Cir. 1988), is misplaced. As an initial matter, that decision is not federal law "as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), so it is pertinent to our habeas review only to the extent it persuasively illuminates Supreme Court precedent. *Dudley* provides little guidance, because it, like *McGuire*, does not involve excluded hearsay. In *Dudley*, a witness testified that he had received threatening phone calls. "[T]he threats admittedly came from an unknown source and were not linked to [defendants] except by prejudicial innuendo." 854 F.2d at 969. The trial court nevertheless declined to exclude the evidence of the threats or to declare a mistrial, decisions that the Seventh Circuit held violated due process. *Id.* at 972. In addition to *Dudley*'s dealing with an entirely different violation—not hearsay, but evidence inadequately connected to the defendant—that case is distinguishable from this one because the trial court there admitted the problematic evidence instead of excluding it, as the trial court did in Hayes's case.

**[17]** Even if we assume that sufficiently prejudicial hearsay might violate due process despite an instruction to the jury

to ignore it, the potential harm to Hayes from Weller's volunteered hearsay does not rise to the level of a due process violation. Weller gave admissible testimony, in nearly the same breath as her statement about the alleged murder contract, that Hayes had threatened to kill her in person. Whatever prejudice Hayes's allegedly offering a contract to do the same might have added to what the jury already knew was too little to undermine the trial's fundamental fairness.

Hayes makes much of Justice Stewart's observation, in concurrence in *Bruton*, that "certain kinds of hearsay . . . are at once so damaging, so suspect, and yet so difficult to discount, that jurors cannot be trusted to give such evidence the minimal weight it logically deserves, whatever instructions the trial judge might give." *Bruton*, 391 U.S. at 138 (Stewart, J., concurring). But, as explained in the discussion of *Bruton* above, the Court in that case addressed a specific situation in which the risk that a jury would disregard its instructions and the harm to the defendant that would follow were particularly acute. Hayes has not demonstrated that similar prejudice, or a similarly high risk of its occurring, existed here.

### D.    *Confrontation of Garcia*

Hayes contends that he was denied his right to confront prosecution witness Debbie Garcia because the trial court prevented him from calling her attorney, Brad Wiles, to testify about communications between Garcia and Wiles. The court prevented Wiles from testifying because it concluded that the attorney-client privilege protected the communications that the defense wanted Wiles to reveal. Hayes argues that his inability to put Wiles on the stand denied him a chance to expose Garcia's bias and motive to deliver testimony favorable to the prosecution, in violation of the Confrontation Clause.

In direct examination of Garcia, the prosecution drew attention to the fact that Garcia supposedly did not actively seek immunity for testifying against Hayes:

Q:  Other than that, insofar as anything that would happen to you, any way, were there any promises made by me or anyone associated with law enforcement other than protection?

A:  No.

Q:  Made to you?

A:  No.

Q:  At what point did you receive immunity in this case?

A:  Before the preliminary hearing, I believe in 1982.

Q:  Did you want it?

A:  No.

Q:  Who suggested it?

A:  I believe you [i.e., the prosecutor] did.

Q:  Did I tell you I wouldn't let you testify without it?

A:  I don't remember. I don't recall.

Q:  Do you recall whether or not it came from you or anyone hired by you, associated with you in any way, to ask for any kind of a deal, bargain, benefit, anything other than protection?

A:  No.

On cross-examination, the defense tried to rebut the notion that Garcia had not affirmatively instructed her attorney, Wiles, to seek immunity on behalf:

Q: Shortly after March 10th, you engaged the services of an attorney; correct?

A: After March 10th?

Q: First day you spoke with authorities.

A: No, huh-uh. No, it was a long time after that I talked to a high school friend who is an attorney.

Q: You engaged the services of Brad Wiles; correct?

A: Just before the preliminary I believe, yes.

Q: You engaged his services within weeks of your first statement to the police in March of 1982; correct?

A: Not as far as I recall.

Q: Did Mr. Wiles tell you that you had had some criminal liability with respect to this incident?

A: No.

Q: Did he tell you that you were liable to be prosecuted for murder?

A: No.

Q: Did he tell you that you needed immunity from prosecution?

A:  No.

Q:  Did he tell you that you could conceivably be looking at the gas chamber?

A:  No.

Q:  Did you tell him or agree with him that you needed immunity?

A:  No.

Q:  Did you ask him to negotiate with the District Attorney's Office here in Santa Cruz for a grant of immunity?

A:  No. It was after the District Attorney had talked about it. I didn't even—I didn't even know what it was. So I contacted him to find out exactly what it was and why they—you know, they suggested it. So why it was needed, so I could understand.

Q:  And this is a couple of months after March of 1982, when you first go to the police; that is what you're telling me?

A:  I thought it was a lot later than that, but I thought it was just before the preliminary, but I could be mistaken.

Q:  The preliminary hearing was in November of 1982; correct?

A:  That's correct.

Q:  And you didn't instruct Mr. Wiles to negotiate with the local District Attorney's Office to

> insure that you get immunity in this case; is that what you're telling me?
>
> A:   I did not, that's correct.

The defense sought to call Wiles to testify and contradict Garcia's testimony about the advice he had given her and whether she had instructed him to seek immunity. The defense had some reason to suspect that Wiles might tell a different story than Garcia. Not knowing that the law firm of Biggam, Christensen & Minsloff represented Hayes, Wiles had contacted Lawrence Biggam to seek advice about representing Garcia. Biggam allegedly told Wiles to get Garcia immunity. Later, Wiles spoke to Jon Minsloff (Hayes's trial counsel) on the phone. He allegedly revealed that: Garcia had contacted him for advice within days of first speaking to the police; he advised Garcia that she could be prosecuted for first degree murder, faced the gas chamber, and needed immunity; Garcia agreed and told Wiles to get her immunity; and he negotiated with the prosecutor for immunity, which she agreed to grant months before it was officially given by court order at the preliminary hearing.

The trial court quashed the defense's subpoena of Wiles, concluding that Garcia had not waived attorney-client privilege as to the communications about which the defense sought to question Wiles.

As a federal court reviewing the denial of a habeas petition, our concern is whether the trial court's privilege ruling, regardless of its correctness under state law, infringed Hayes's constitutional right to confront Garcia. *See McGuire*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States.").

**[18]** The Supreme Court has held that, under certain circumstances, otherwise permissible exclusions of evidence from a criminal trial can deny a defendant's right under the Confrontation Clause to cross-examine witnesses against him. *See, e.g.*, *Davis v. Alaska*, 415 U.S. 308 (1974) (state law making records of juvenile offense inadmissible unconstitutionally limited the scope of defendant's cross-examination of an adverse witness for bias); *Douglas v. Alabama*, 380 U.S. 415 (1965) (witness's invocation of the Fifth Amendment privilege against self-incrimination denied the defendant an opportunity for effective cross-examination). Adequate cross-examination entails not only the right "to ask [the witness] whether he was biased," but also the right "to make a record from which to argue why [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." *Davis*, 415 U.S. at 318. Hayes contends that Wiles's testimony was necessary to establish a basis for impeaching Garcia on the ground that, contrary to her testimony, she had actively sought immunity with Wiles's help.

**[19]** A defendant's right to cross-examine adverse witnesses is not unlimited, though. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). "The Supreme Court consistently has held that a Confrontation Clause violation occurs when a trial judge prohibits *any* inquiry into why a witness may be biased." *United States v. Larson*, 495 F.3d 1094, 1108 (9th Cir. 2007) (en banc) (Graber, J., concurring). However, when some inquiry is permitted, "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination." *Van Arsdall*, 475 U.S. at 679. "No Confrontation Clause violation occurs 'as long as the jury receives sufficient information to appraise the biases and motivations of the witness.'" *Larson*, 495 F.3d at 1109 (Graber, J., concurring,

but writing for a majority of the court on this point) (quoting *United States v. Shabani*, 48 F.3d 401, 403 (9th Cir. 1995)).

**[20]** Hayes's cross-examination of Garcia gave the jury ample opportunity to appraise her biases and motivations. Hayes was not barred from asking Garcia whether she actively sought immunity. He did ask her, and she denied pursuing it. Hayes claims entitlement not just to the opportunity to question Garcia about this potential bias, but to put on an additional witness to refute Garcia's responses. This is more than the Confrontation Clause guarantees in light of the limited potential value of the proposed testimony from Wiles. The jury was well aware that Garcia had immunity. Whatever pro-prosecution bias might flow from that fact alone was plainly revealed. Even if Wiles's testimony could have established definitively that Garcia sought immunity rather than having it "forced" upon her, that difference was unlikely to have changed the jury's impression of her motivations. The fact of having immunity at all provided most of the reason that jurors might view Garcia's testimony skeptically. In any case, Wiles's proposed testimony was relevant only to impeaching Garcia on the collateral issue of her immunity deal. It did not relate to her testimony implicating Hayes, and so it was unlikely to influence the jury's impression of Garcia's trustworthiness on the central issue of Hayes's guilt.

Moreover, the proposed testimony by Wiles would not have been especially impeaching of Garcia. That Wiles may have thought that it was important for Garcia to obtain immunity does not mean that Garcia did or that she understood what Wiles sought to negotiate on her behalf with the prosecutor. Garcia's testimony about when she received immunity was equivocal and acknowledged that she "could be mistaken." Garcia testified that she "didn't even know what [immunity] was" before her involvement in the trial. That Wiles had a different perception of immunity would not have had represented much of a contradiction.

A recent en banc decision of our court in a case with analogous facts supports our denial of relief, though the fractured opinions in that case provided no majority rationale. In *Murdoch v. Castro*, 609 F.3d 983 (9th Cir. 2010) (en banc), the defendant sought disclosure of a letter a prosecution witness, Dinardo, sent to his lawyer. The letter allegedly revealed that Dinardo had been coerced into testifying against the defendant, and that his testimony was false. The defendant sought the letter as a basis for impeaching Dinardo, but the trial court denied access on the ground that it was protected by attorney-client privilege. *Id.* at 987.

A five-judge plurality of the en banc court held that "the Supreme Court has not clearly established whether and in what circumstances the attorney-client privilege must give way in order to protect a defendant's Sixth Amendment confrontation rights." *Id.* at 995-96. The plurality concluded, as a result, that it could not grant relief under AEDPA. *See* 28 U.S.C. § 2254(d)(1). Judge Silverman provided the outcome-determinative sixth vote, but he concurred under different reasoning. Judge Silverman reasoned that "[t]here was no conflict" between the attorney-client privilege and the Confrontation Clause, because the defendant's lawyer did not move to strike the testimony as to which cross-examination was limited. 609 F.3d at 996 (Silverman, J., concurring).

**[21]** The *Murdoch* opinions suggest the same result we have independently reached, because the conditions of both the *Murdoch* plurality and Judge Silverman's concurrence are satisfied in this case: (1) cross-examination was limited because of attorney-client privilege, and (2) and the defendant did not seek to strike the testimony he claims was not fully subject to cross-examination. But neither rationale garnered a majority of the court in *Murdoch*. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of [a majority], the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v.*

*United States*, 430 U.S. 188, 193 (1977) (quotation and citation omitted); *see also Bradley v. Henry*, 518 F.3d 657 (9th Cir. 2008), *amending* 510 F.3d 1093 (9th Cir. 2007) (applying the *Marks* rule to an en banc decision of the Ninth Circuit). *The Marks* rule does not distill a majority from the *Murdoch* votes, because the plurality opinion and Judge Silverman's concurrence offer independent ways of reaching the same result. Neither is broader or narrower than the other.[2] *See United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1140 (2005) (Berzon, J., dissenting in part) ("*Marks* is workable— one opinion can meaningfully be regarded as 'narrower' than another—only when one opinion is a logical subset of other, broader opinions. In essence, the narrowest opinion must present a common denominator of the Court's reasoning." (quotation and citation omitted)). While the *Murdoch* court, were it presented with this case, would reach the same result we do, the lack of a majority rationale in that case leads us to rely on our own Confrontation Clause analysis. We conclude that the district court properly denied this claim.

### E.   The Prosecution's Failure to Correct False Testimony

This issue, like the previous one, arises out of Garcia's immunity deal and her testimony about it. Hayes argues that the prosecution did not correct testimony from Garcia about her immunity that it knew was false. He asserts that Garcia lied about (1) when she received immunity and (2) whether she actively sought immunity through her lawyer Wiles, and that Garcia's false testimony made her appear more credible than she really was.

---

[2]The plurality could be considered broader in the sense that it would deny habeas relief for all confrontation claims based on attorney-client privilege, without regard to whether a defendant moved to strike the testimony allegedly not subject to full cross-examination. But Judge Silverman's concurrence is broader than the plurality in the sense that it would deny all confrontation claims in the absence of a motion to strike, not just those rooted in attorney-client privilege.

**[22]** The Supreme Court has long and repeatedly held that "deliberate deception of a court and jurors by the presentation of false evidence is incompatible with 'rudimentary demands of justice' " and thus violates the Due Process Clause of the Fourteenth Amendment. *Giglio v. United States*, 405 U.S. 150, 153 (1972). "The same result obtains" when the government allows false evidence "to go uncorrected when it appears" as when it solicits false evidence directly. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). *Napue*'s rule covers falsehoods that bear only on a witness's credibility as much as it covers falsehoods pertinent to a defendant's guilt. *Id.* at 269-70. Hayes's contentions that Garcia lied about her immunity agreement, uncorrected by the prosecution, in ways that bolstered her credibility are therefore cognizable under *Napue*.

To succeed on a *Napue* claim, a defendant "must show that (1) the testimony (or evidence) [presented by the prosecution] was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) that the false testimony was material." *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003). False testimony is material in this context if "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc). Hayes fails to meet the first two requirements: he has not demonstrated that either falsehood he attributes to Garcia was actually false, or that the prosecution knew as much.

**[23]** As noted above, Garcia's testimony about precisely when she received immunity was mostly equivocal. Garcia's understanding that she received immunity "[b]efore the preliminary hearing, I believe in 1982" was consistent with a reasonable assumption that she did not officially have immunity until the court formally granted it before the preliminary hearing in November of 1982. The defense's different understanding—that she effectively had immunity earlier, as soon as the prosecution agreed to it with her lawyer—is not definitive, regardless of the prosecution's later agreement

with it in a settled statement on appeal. Garcia never claimed to be certain of when she received immunity. On the contrary, she said she "thought it was a lot later than [the defense suggested], . . . just before the preliminary," but that she "could be mistaken." The prosecution had no obligation to correct Garcia's qualified testimony about her own reasonably held belief, because it was not actually false.

**[24]** Neither did Garcia testify falsely about whether she actively sought immunity through her lawyer Wiles. She was asked, "Do you recall whether or not it came from you or anyone hired by you, associated with you in any way, to ask for any kind of a deal, bargain, benefit, anything other than protection?" She answered "No." That answer proved nothing useful to Hayes because it simply denied recalling who introduced the idea of immunity.

Hayes attempts to contradict Garcia's denial of seeking immunity with (1) evidence of conversations between Garcia and Wiles (as detailed above, in connection with Hayes's confrontation claim) and (2) the fact that Wiles supposedly "negotiated" for immunity on Garcia's behalf. On the first point, the prosecution had no way of knowing of Garcia's motivation to seek immunity as revealed in confidential communications with her lawyer. The government could not, and was not required to, correct a supposed misstatement that it did not know was false. *See Zuno-Arce*, 339 F.3d at 889.

On the second point, the prosecution's position was that Wiles did not "negotiate" for immunity before the preliminary hearing, because the prosecution had already agreed to grant Garcia immunity—consistent with the theory that it was the prosecution's idea—before the first conversation between Wiles and the prosecution took place. Wiles's discussion with the prosecutor was limited to ensuring "that the in-court grant [of previously-agreed-to immunity] was done in proper form."

**[25]** As no testimony by Garcia was proven to be false, or false in a way that the prosecution knew or should have known about, the district court correctly denied this claim.

## F.   Security Procedures at Trial

Hayes asserts that the trial court's approval of security measures that he contends were unnecessary denied him due process of law and a fair trial by conveying to jurors that he was unusually dangerous.

The district attorney's office requested extra security at Hayes's trial. The court consulted with court security personnel and investigators from the district attorney's office, who voiced concerns about the security of witnesses who had been threatened and about the possibility that Hayes might escape. Hayes had escaped once before from a mental health institution in which he was detained. Over Hayes's objection, the court permitted screening of everyone who entered the courtroom. Security provisions included use of a hand-held metal detecting wand, patdown of outer clothing, examination of bags and purses for weapons, locking the courtroom door, and posting an extra deputy in the courtroom and two additional deputies outside the courtroom. Prospective jurors, who only received identification badges after they were selected, were screened alongside the general public until a jury was picked.

**[26]** *Holbrook v. Flynn*, 475 U.S. 560 (1986), which the California Supreme Court explicitly considered in affirming Hayes's conviction, *Hayes*, 21 Cal. 4th at 1268-69, establishes the framework for analyzing whether courtroom security measures violate a defendant's right to a fair trial. We must first "look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial." *Holbrook*, 475 U.S. at 572. In assessing inherent prejudice, the question is "whether an unacceptable risk is presented of impermissible factors coming into play" in the jury's evalua-

tion of the defendant. *Id.* at 570 (internal quotation marks omitted). If security measures are not found to be inherently prejudicial, a court then considers whether the measures actually prejudiced members of the jury. *Id.* at 572. "[I]f the challenged practice is not found inherently prejudicial and if the defendant fails to show actual prejudice, the inquiry is over." *Id.*

**[27]** The security screening procedures employed in Hayes's trial were not inherently prejudicial. In *Holbrook*, the Court concluded that the presence of uniformed security officers sitting behind the defendants at trial was not inherently prejudicial. The Court distinguished cases where defendants were shackled or required to appear in prison garb before the jury:

> The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. . . . Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

475 U.S. at 569. *Holbrook* directly establishes that the placement of deputies in and outside the courtroom at Hayes's trial

was not inherently prejudicial. *See also Williams v. Woodford*, 384 F.3d 567, 588 (9th Cir. 2004) (denying habeas relief because placement of additional security personnel in the courtroom was not inherently prejudicial). *Holbrook*'s logic also permits the entry-screening procedures. If uniformed guards sitting directly behind a defendant "need not be interpreted as a sign that he is particularly dangerous or culpable," 475 U.S. at 569, then the mere screening of all who enter the courtroom certainly should not be. Indiscriminate screening at the courtroom door permits an even "wider range of inferences" than strategically placed guards, and it suggests even more strongly that the security is designed "to guard against disruptions emanating from outside the courtroom." *Id.*

**[28]** Further, Hayes has not shown that he was actually prejudiced by the security measures. The California Supreme Court considered the actual impact of the measures, and found that

> those prospective jurors who were questioned about [security measures] during voir dire viewed [them] as a routine procedure like [those] at an airport, a good idea, indicative that there was something important or a "big" or "severe" case [being tried]. . . . No prospective juror responses during voir dire about either their own reactions or those of other persons whose comments they overheard expressed concern that defendant might be dangerous.

*Hayes*, 21 Cal. 4th at 1268. Hayes offers no evidence to contradict the state supreme court's analysis of whether jurors were actually influenced by the measures he complains of. *Cf. Williams*, 384 F.3d at 588 (holding that "conclusory allegations by counsel that are unsworn and unsupported by any proof or offer of proof" do not permit a finding of actual prejudice.). Relief on this claim was properly denied.

### G.  Delay on Direct Appeal

Hayes argues that the nearly eleven-year delay between his sentencing and the filing of his opening brief on direct appeal to the California Supreme Court violated his right to due process on appeal.

The California Supreme Court received notice of Hayes's death sentence and docketed his automatic appeal on August 26, 1986. The court appointed H. Peter Young to represent Hayes on December 10, 1986. The certified record was filed on January 13, 1993. After requesting and receiving numerous extensions of time to file Hayes's opening brief, Young was relieved of his appointment on April 4, 1995, without ever filing an opening brief. Eric S. Multhaup was appointed to represent Hayes on July 16, 1995. Multhaup filed an opening brief on July 31, 1997. After discounting the time it took to complete the record (four years) and the period during which Multhaup worked on the opening brief (two years), a delay of five years remains unexplained. Hayes contends that this five-year delay was excessive and entitles him to a new trial.

**[29]** We cannot grant relief on this claim because no "clearly established Federal law, as determined by the Supreme Court of the United States" recognizes a due process right to a speedy appeal. 28 U.S.C. § 2254(d)(1). Hayes relies on *Barker v. Wingo*, 407 U.S. 514 (1972), but that case established only the contours of the right to a speedy trial, not an appeal.

Hayes cites circuit court decisions that have applied the analytical framework of *Barker* to delayed appeals and held that appellate delay can violate due process or the right to counsel. *See United States v. Davis*, 55 F.3d 517 (10th Cir. 1995); *Harris v. Champion*, 15 F.3d 1538 (10th Cir. 1994); *Coe v. Thurman*, 922 F.2d 528 (9th Cir. 1990).**[3]** Lower courts'

---

**[3]** *Coe* and *Harris* are pre-AEDPA decisions and *Davis* is a direct appeal from a criminal conviction, so none of the courts that decided these cases were bound—as we are by AEDPA's 28 U.S.C. § 2254(d)(1)—to apply only law clearly established by the Supreme Court.

extensions of *Barker* to a new setting, however, cannot be the basis of habeas relief after AEDPA. "[W]hen a Supreme Court decision does not 'squarely address[ ] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context," 28 U.S.C. § 2254(d)(1) requires that we deny relief. *Moses v. Payne*, 555 F.3d 742 (9th Cir. 2009) (quoting *Wright v. Van Patten*, 552 U.S. 120, 125 (2008)) (second, third, and fourth alteration in original). No Supreme Court decision "squarely addresses" the right to a speedy appeal, nor does the right to a speedy trial "clearly extend" to the appellate context. The interest in a prompt initial adjudication of a defendant's rights, which underlies the right to a speedy trial, is plainly not the same as the interest in having a trial court conviction reviewed quickly on appeal.

**[30]** Moreover, Hayes identifies no prejudice that resulted from the delay, and we see none. The passage of time did not adversely affect the California Supreme Court's review of the issues Hayes presented, and he does not point to any issue he was unable to pursue because of the delay. Nor does he explain why time taken by counsel appointed to represent him should be attributed to the State, or why it should prevent the State from holding him responsible for his criminal conduct. The district court properly denied relief on this claim.

### H.    *Cumulative Error*

**[31]** Citing *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993), Hayes argues that his conviction should be vacated because of the cumulative prejudice of the claimed constitutional errors discussed above, even if the errors were not individually prejudicial. *See Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) ("[E]ven if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.' *United States v. de Cruz*, 82 F.3d 856, 868 (9th Cir. 1996)."). Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible. *See*

*United States v. Larson*, 460 F.3d 1200, 1217 (9th Cir. 2006) (rejecting cumulative error claim where we "discovered no error" in the defendants' trial).

**AFFIRMED.**

---

B. FLETCHER, Circuit Judge, dissenting.

I respectfully dissent. The guilt phase of Hayes's trial should have been transferred out of Santa Cruz County because the considerable adverse pretrial publicity created a presumption of prejudice among the jury pool.

In *Sheppard v. Maxwell*, the Supreme Court held that due process requires a change of venue or a continuance when the defendant can show a "reasonable likelihood that prejudicial news prior to trial will prevent a fair trial." 384 U.S. 333, 363 (1966). More specifically, because a criminal defendant has the right to an impartial jury, a court must grant a motion to change venue "if prejudicial pretrial publicity makes it impossible to seat an impartial jury." *Daniels v. Woodford*, 428 F.3d 1181, 1210 (9th Cir. 2005) (citation omitted). In the context of a petition for a writ of habeas corpus, the federal court must conduct "an independent review of the record to determine whether there was such a degree of prejudice against the petitioner that a fair trial was impossible." *Id.* (citation omitted). In the recent case of *Skilling v. United States*, 130 S. Ct. 2896, 2915-16 (2010), the Supreme Court focused on four issues in determining whether a presumption of jury prejudice was appropriate: (1) the size and characteristics of the community in which the crime occurred; (2) whether the information was "blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight"; (3) the time that elapsed between the height of media coverage and the trial; and (4) jury actions with respect to earlier prosecutions of similar or related crimes. Here, the major-

ity recognizes that the first factor, or the size of the community in which the crime took place, weighs in favor of finding presumed prejudice. Maj. op. at 504.

As to the second factor, the majority characterizes the information contained in the pretrial publicity as "unflattering," but concludes that this was not the type of vivid, unforgettable information that would warrant a change of venue. The majority mischaracterizes and significantly dilutes the shocking nature of the information and images to which the jury pool was exposed prior to the trial. The pretrial coverage included explicit pictures of the victims' remains revealing the condition of the exhumed skulls and that the victims' heads and hands had been chopped off. These images are well beyond merely "unflattering," and constitute the type of shocking imagery that, once seen, would be impossible to forget. Indeed, the transcript of the voir dire reveals that many of the jurors specifically recalled hearing or reading prior to trial about the condition of the victims' remains. If that is not enough, information was released revealing that Hayes had been charged with two prior murders in other states. One of the articles discussing Hayes's previous murder charges also described his stay at a mental hospital in Portland, Oregon.

The majority's suggests that publicity amounting to a public confession such as that in *Rideau v. Louisiana*, 373 U.S. 723 (1963) is the only sort of pretrial publicity that creates presumed prejudice. Certainly, the interrogation and confession at issue in *Rideau* had an undeniable effect on the defendant's ability to receive a fair trial. *See* 373 U.S. at 727. However, the majority's suggestion is a far too narrow reading of the case. The proper focus of our inquiry is not on whether the publicity to which the jury was exposed is exactly the same as that in previous cases, but rather on whether it is the type that would stick in the minds of community members, rendering it impossible to assure an impartial verdict. *See Daniels*, 428 F.3d at 1210 (noting that the relevant inquiry is whether "there was such a degree of prejudice against the

petitioner that a fair trial was impossible"). Indeed, *Skilling* does not limit prejudice from pretrial media exposure to filmed confessions, but rather acknowledges that there may be "other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight" or that could be "imprinted indelibly in the mind of anyone who watched it." *Skilling*,130 S. Ct. at 2916. Grotesque depictions and descriptions of victim body parts, combined with stories about the defendant's criminal history and mental instability, are precisely the type of information that infiltrates the minds of community members so that they can no longer render a truly impartial decision based only on the evidence presented in the trial itself.[1]

With respect to factor three (elapsed time), the majority points out that the bulk of the pretrial publicity in this case was released only one to two years before voir dire. Notably, in both *Skilling* and *Patton*, cited by the majority to support its conclusion regarding the passage of time, four years had passed since the height of the adverse publicity before trial, or more than twice the amount of time here. 130 S. Ct. at 2916; *Patton v. Yount*, 467 U.S. 1025, 1032 (1984). The majority contends that Hayes failed to establish that "the publicity preceding his trial had a greater negative impact than that . . . in *Yount* ". Maj. op. at 505. However, the analysis ignores the fact that the primary reason that the publicity in *Yount* did not amount to a due process violation was because

---

[1]Careful attention should be paid to two disturbing facts. The trial court granted Hayes's motion for change of venue for the penalty phase of the trial, although it denied the motion at the guilt phase. The transcript reveals that the trial judge admitted that he took cost into consideration in making his first ruling. Second, he stated on the record his support for a pending bill that would not allow motions for change of venue to be granted until after voir dire. The trial judge blatantly and openly considered costs and other political issues in ruling upon the motion for change of venue. In the face of overwhelming evidence indicating that the jury was tainted by previous media exposure, he considered costs to the court to be more important.

the passage of time (four years) rebutted "any presumption of partiality or prejudice." *Yount*, 467 U.S. at 1033-35. A review of *Yount* makes clear that it was the passage of four years that blunted the memories of the perspective jurors and minimized the dangers of prejudicial exposure to pretrial media coverage.

By contrast, the transcript of the voir dire here reveals that the passage of only one or two years was insufficient to erase the taint that had spread throughout this small community from the sensational media coverage of the case. In addition, in arguing the venue issue before the lower court, defense counsel made the judge aware of the results of an informal survey taken among the members of the Santa Cruz County community, which revealed that 71% of the community members had read something about the case prior to voir dire. In other words, despite the passage of time, on the first day of trial nearly three-fourths of the members of the community recalled something about the case from previous media exposure. Undoubtedly, an even greater proportion had their memories of the gruesome details triggered by the testimony and facts that would be revealed over the course of the trial. These memories could be nothing short of prejudicial. The trial judge, however, gave almost no consideration to the telling results of this survey.

As to the final *Skilling* factor, we have not been presented with sufficient information to usefully assess prior jury decisions with respect to similar crimes. It is interesting to note, however, that, near the time Hayes originally moved for a change of venue, four other homicide cases were transferred from Santa Cruz County, this very county, to other counties based upon the community's exposure to media coverage.

I respectfully dissent. I would grant Hayes's habeas petition on the grounds that the lower court's failure to grant his motion for change of venue violated his right to an impartial jury and to due process of law.