Shon Ramone YOKELY, Petitioner,

v.

Anthony HEDGEPETH, Warden, Respondent.

Case No. CV 10–8218–GAF (MLG).

United States District Court, C.D. California, Western Division.

July 20, 2011.

---

Peter H. Gold, Peter H. Gold Law Offices, San Francisco, CA, for Petitioner.

Michael A. Katz, Office of Attorney General of California, Los Angeles, CA, for Respondent.

## ORDER ACCEPTING AND ADOPTING FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

GARY A. FEESS, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the Court has reviewed the Petition, the records on file and the Report and Recommendation of the United States Magistrate Judge. The Court has also conducted a *de novo* review of those portions of the Report and Recommendation to which Petitioner has objected. The Court accepts the findings and recommendations of the Magistrate Judge.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

MARC L. GOLDMAN, United States Magistrate Judge.

## I. Background

### A. Procedural History

In 1992 Petitioner Shon Yokely was convicted of one count of first degree murder (Cal. Penal Code § 187), three counts of attempted murder (Cal. Penal Code §§ 187, 664), and one count of conspiracy to commit murder (Cal. Penal Code § 182(1)). These convictions were predicated on a drive-by shooting in which 14-month old Mitchshalae Davis was killed and her mother, Katie Jones, and Katie's brothers, John Paul and Albert Jones, were wounded.

On August 12, 1999, after exhausting state remedies, Petitioner filed an amended petition for writ of habeas corpus in this Court, raising various claims for relief, including the argument that his Sixth Amendment right to counsel was violated because defense counsel was not present at a live lineup in which eyewitnesses Vernon Cox and John Paul Jones identified Petitioner as the shooter and that he was denied the effective assistance of counsel when his attorney failed to object to the admission at trial of testimony regarding the out of court identification. *Yokely v. Ayers,* Case No. CV 99-7112-GAF (MLG).

On June 29, 2000, the amended petition was dismissed as untimely filed, but that decision was reversed on appeal, and the matter remanded for consideration on the merits. *Yokely v. Ayers,* 46 Fed.Appx. 442 (9th Cir.2002).

On July 10, 2003, a hearing was held on the merits of the petition, during which counsel for Respondent stated that it was unnecessary for the Court to hold an evidentiary hearing on the issue of whether there was an independent basis for the challenged identifications independent from the unconstitutional lineup.

On February 20, 2007, a Report and Recommendation was filed recommending that the petition be granted. The recommendation was based on the finding that Petitioner's Sixth Amendment right to counsel had been violated because no attorney was present during the live lineup and that Petitioner's trial counsel was ineffective in failing to object to introduction of the evidence of the identifications made at the lineup. On May 11, 2007, United

States District Court Judge Gary A. Feess adopted the Report and Recommendation and granted federal habeas corpus relief to Petitioner. No appeal was taken from this judgment.

In June 2007, the Los Angeles County District Attorney filed a new information charging Petitioner with the same offenses. Petitioner filed a pre-trial motion to suppress the in-court identifications of Petitioner by Cox and John Paul Jones. An evidentiary hearing as held at which the trial court heard the testimony of Vernon Cox, John Paul Jones, and Petitioner. At the conclusion of the hearing, the court found that the identifications of Petitioner by the two witnesses had origins independent of the tainted lineup and therefore admitted their identification testimony at trial. (Augmented Reporter's Transcript at 3, 307–323; Reporter's Transcript ("RT") at 605–690.)

On March 28, 2008, Petitioner was again convicted by a Los Angeles County Superior Court jury of one count of first degree murder (Cal. Penal Code § 187), three counts of premeditated attempted murder (Cal. Penal Code §§ 187, 664), and one count of conspiracy to commit murder (Cal. Penal Code § 182(a)(1)). The jury found true the allegations that Petitioner personally used a handgun (Cal. Penal Code § 122022.5(a)) and that a principal was armed with a handgun (Cal. Penal Code § 122022(a)(1)) as to counts one through four. The jury also found true the allegation that Petitioner personally inflicted great bodily injury by discharging a firearm from a motor vehicle (Cal. Penal Code § 12022.55) as to counts one and

four. (Clerk's Transcript ("CT") at 1–6, 99–103.) On December 3, 2008, the trial court sentenced Petitioner to prison for a term of thirty-one years to life plus three consecutive terms of six years to life. (CT at 116–119.)

Petitioner filed an appeal in the California Court of Appeal, raising the following claims for relief: (1) Petitioner's Fifth and Sixth Amendment rights were violated when the trial court admitted the in-court identifications of eyewitnesses Vernon Cox and John Paul Jones; (2) Petitioner's right to due process was violated when the trial court refused to grant a mistrial after witnesses referred to the live lineup and Petitioner's previous trial; (3) Petitioner's Sixth Amendment right to counsel was violated when the trial court refused to allow Petitioner's retained attorney to assist as advisory counsel at trial; and (4) Petitioner's Sixth Amendment right to counsel was violated when the trial court refused to allow Petitioner to discharge his retained attorney. On April 15, 2010, the California Court of Appeal affirmed the judgment with certain sentencing modifications. (Lodgment D.) On May 18, 2010, Petitioner filed a petition for review in the California Supreme Court (Lodgment E), which was denied on July 28, 2010. (Lodgment F.)

On November 10, 2009, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, raising for the first time the claim that his right to due process was violated when the prosecution permitted its key witness to give materially false testimony as to the nature of a prior conviction.[1] (Lodgment I.) On May

---

1. Petitioner originally raised this claim in a state habeas petition while his direct appeal was still pending. The California Court of Appeal rejected it because Petitioner was represented by counsel on direct appeal and was not allowed to file a pro per habeas petition at that time. (Lodgments G, H.) After the state court of appeal affirmed the judgment on direct appeal, Petitioner attempted to raise this claim twice in the California Supreme Court, but it was rejected on procedural grounds because Petitioner did not state his claim with particularity and because he raised the same claim in a prior state habeas

12, 2010, the California Supreme Court denied the petition. (Lodgment J.)

On January 14, 2011, Petitioner filed an amended habeas corpus petition in this Court, presenting the four claims for relief that he had raised in his direct appeal and the claim for relief raised in his petition in the California Supreme Court. On April 21, 2011, Respondent filed an answer to the petition. On May 18, 2011, Petitioner filed a reply. The matter is now ready for decision.

## B. Facts

### 1. The Murder

The underlying facts, which are supported by the trial record, are taken from the partially published opinion of the California Court of Appeal. *People v. Shon Ramone Yokely,* No. B213003 (Lodgment D). In all quoted sections of this Report, the term "Petitioner" is substituted for "Defendant."

Shortly after 7:00 p.m. on Sunday, July 7, 1991, Katie Jones and her fourteen-month old daughter, Mitchshalae Davis, arrived at their home in the Willowbrook area of Los Angeles. Katie and Mitchshalae lived at the house with Katie's mother. Katie's brothers John Paul and Albert were in the front yard.

Katie parked her car on the street in front of the house. She put Mitchshalae on the sidewalk and began to unload the trunk. Albert came out to help Katie; he lifted Mitchshalae over the fence separating the front yard from the street, and handed her to John Paul. John Paul set Mitchshalae down so she could walk into the house.

John Paul saw a blue Jeep Cherokee with loud music playing turn onto the street. The car approached slowly with the windows down. John Paul said he saw three African–American men in the car. The man sitting behind the driver was light skinned, had a dry jheri-curl hairstyle, and his ears "poked out" from his head. John Paul later identified that man as Petitioner, both from a photo lineup and in open court. Petitioner put his arms and upper body through the window. He was holding a black firearm in both hands out in front of him. Petitioner started shooting.

Albert was shot in the shoulder and fell to the sidewalk bleeding. As Katie went toward him, she was hit in the left leg above the knee. John Paul ran toward Mitchshalae, but he fell when a bullet struck him in the right leg and shattered his femur. He crawled toward Mitchshalae, who was lying on her back in the yard. Mitchshalae had been shot in the face. She was conscious, but John Paul could see she was gravely wounded. He covered her with his body so that Katie could not see her. Before help arrived, Mitchshalae died.

The Jeep Cherokee sped away.

### 2. Testimony of Vernon Cox

In July 1991, Vernon Cox was 15 years old. Cox formerly was an associate of the Holmes Street Watts Crips street gang. Cox had a friend named Rance Hill who lived in an apartment near 125th Street and Western Avenue, approximately two miles from the Jones residence.

On July 7, Cox went to visit Hill. He found Hill leaving his apartment building in a blue Jeep Cherokee driven by Darrell Whitson. Whitson was a member of the 118th Street East Coast Crips street gang with the gang moniker "Little D." The Crips gangs were rivals of

petition. (Lodgments I–L.) Petitioner raised the claim a third time in the California Supreme Court, but then withdrew the petition. (Lodgments M, N.)

Blood gangs. Cox joined Hill and Whitson in the Jeep.

The three drank cognac and beer and smoked marijuana at various locations before returning to Hill's apartment. Cox, who had not eaten, vomited and felt better after doing so. Hill asked Cox and Whitson to leave the apartment for awhile so that he could be alone with a girl.

Cox and Whitson got back in the Cherokee with Whitson driving and Cox in the front passenger seat. Whitson drove east into territory controlled by the East Coast Crips. Whitson saw a friend of his and stopped the Cherokee. Cox identified Whitson's friend as Petitioner.

Whitson and Petitioner talked for a minute or two. Petitioner asked Whitson what he was about to do. Whitson answered that they were going to roll around to see if they could see some Bloods. Petitioner said he wanted to come along. Petitioner ran toward a house. When he came back, he appeared to be holding something in his waistband. Petitioner got in the back of the Cherokee. Whitson drove generally southward, into territory controlled by the Athens Park Boys, a Blood street gang.

After a few minutes, the Cherokee turned left onto the street where the Joneses lived. Cox saw two men standing near the second house on the block. As they drove past the house, Cox heard three gunshots. He saw the men going down but could not tell whether they were ducking or had been shot. Cox saw Petitioner leaning out of the driver's side rear window of the Cherokee, holding a black gun in both hands. They drove away and dropped Petitioner off near where they had picked him up. Petitioner said that he was going to put the rest of the bullets in his gun, but Whitson and Cox did not wait for him.

They drove back to Hill's apartment building.

Two months later, the police came to Cox's home to interview him about the shooting. Cox cooperated. Cox identified Whitson as the driver of the Jeep from a photo lineup. He identified Petitioner as the shooter from another photo lineup, although he told the police that he was not "100 percent sure." Cox said that the picture of Petitioner looked most like the shooter. Cox explained that, at the time, he did not know Petitioner and did not know what might happen to him if he identified Petitioner, but he "tried his best to do what [he] thought was right." Cox testified that he also identified Petitioner as the shooter at a court proceeding in 1992. Cox was granted immunity in exchange for his testimony.

### 3. Other Evidence

John Paul gave the police a description of the shooter while in the hospital the night of the shooting. The description generally matched Petitioner's appearance. Police found the blue Jeep Cherokee the next day. The car was traced to Whitson, who apparently implicated Petitioner. Police asked Petitioner to come to the police station voluntarily for questioning. As a deputy sheriff transported Petitioner to the station, Petitioner told the deputy that he was a former member of the 118th Street East Coast Crips, known by the gang moniker "Calbo." A gang expert testified that the 118th Street East Coast Crips were deadly rivals of the Athens Park Boys, a Blood gang.

When interviewed by the police, Petitioner stated that on the day of the murder, he had been at a motel on Western Avenue with a girl who was visiting the area from Arizona. Police

checked the registration records of the motel and were unable to verify Petitioner's alibi. Petitioner presented similar alibi testimony at trial. Petitioner denied he was a member of the 118th Street East Coast Crips. He testified that he used to be associated with a different clique of the East Coast Crips based in Carson.

(Lodgment D at 3–6.)

## II. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal habeas corpus relief is available to state prisoners who are in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). To establish a right to relief, a petitioner must show that the state's highest court rejected the petitioner's claim on the merits, and that this rejection was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d); *Harrington v. Richter*, —— U.S. ——, 131 S.Ct. 770, 783–84, 178 L.Ed.2d 624 (2011). These standards apply regardless of whether the state court explained its reasons for rejecting a prisoner's claim. *Richter*, 131 S.Ct. at 784 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.").

It is not enough that a federal court conclude "in its independent judgment" that the state court decision is incorrect or erroneous. *Yarborough v. Alvarado*, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24–25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam)). "The

state court's application of clearly established law must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *see also Renico v. Lett*, —— U.S. ——, 130 S.Ct. 1855, 1865, 176 L.Ed.2d 678 (2010). AEDPA imposes a " 'highly deferential standard for evaluating state-court rulings; which demands that state-court decisions be given the benefit of the doubt.' " *Bell v. Cone*, 543 U.S. 447, 455, 125 S.Ct. 847, 160 L.Ed.2d 881 (2005) (quoting *Woodford*, 537 U.S. at 24, 123 S.Ct. 357); *Vasquez v. Kirkland*, 572 F.3d 1029, 1035 (9th Cir. 2009).

Habeas relief is unavailable if "fairminded jurists could disagree" about the correctness of the state court decision. *Richter*, 131 S.Ct. at 786 (quoting *Yarborough*, 541 U.S. at 664, 124 S.Ct. 2140) (internal quotation marks omitted). For habeas relief to be granted, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S.Ct. at 786–87.

In applying these standards, the Court looks to the last reasoned state court decision. *See Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir.2008); *see also Mendez v. Knowles*, 556 F.3d 757, 767 (9th Cir.2009) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)). The claims raised in the instant petition were presented to the California Supreme Court, but that court did not issue a reasoned decision. (Lodgment F.) Accordingly, this Court must "look through" the unexplained California Supreme Court decision to the last reasoned decision as the basis for the state supreme court judgment. The California Court of Appeal, in a reasoned opinion on

the merits, rejected each of Petitioner's claims on the merits except for Ground Three. (Lodgment D.) Therefore, this Court will consider the reasoning of the California Court of Appeal to determine whether the California Supreme Court's decision is contrary to, or an unreasonable application of, clearly established federal law.

■ In a petition for writ of habeas corpus to the California Supreme Court, Petitioner raised his claim in Ground 3. (Lodgment I.) The California Supreme Court summarily denied this habeas petition. (Lodgment J.) "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Richter,* 131 S.Ct. at 784.

## III. Discussion

### A. The Trial Court Did Not Violate Petitioner's Constitutional Rights When It Admitted the Testimony of Cox and Jones at Petitioner's Retrial

Petitioner contends that, based upon this Court's granting of his habeas petition in 2007, the doctrines of collateral estoppel and law of the case prohibited the trial court from admitting Vernon Cox's and John Paul Jones's in-court identifications on retrial. Petitioner further contends that, even if these doctrines do not apply, the trial court violated his constitutional rights when it admitted these eyewitness identifications because this Court had previously ruled on habeas that the live lineup was tainted, and the in-court identifications were not from a source independent of the live lineup. (Pet. at 5; Mem. of P & A at 3–27.) The Court will address each argument in turn.

As noted above, habeas relief was granted to Petitioner in May 2007 for the following reasons: Petitioner's Sixth Amendment right to counsel was violated because Petitioner's attorney was not present at a live lineup at which Vernon Cox, John Paul Jones and Albert Jones identified Petitioner as the shooter. Petitioner was denied his Sixth Amendment right to effective assistance of counsel because his attorney failed to object to the admission of testimony regarding the unconstitutional lineup identifications, which testimony was excludable per se, and failed to object to the in-court identifications of Petitioner by Vernon Cox and John Paul Jones. It was found that Petitioner had been prejudiced by trial counsel's failure to object to the in-court identification by Vernon Cox because, based on the record of Petitioner's trial, the prosecution probably could not have established by clear and convincing evidence that Cox's identification of Petitioner was not tainted by the unconstitutional lineup. Further, had Cox's identification been excluded, there was a reasonable probability that Petitioner would not have been convicted. However, it was further found that, had Petitioner moved to suppress the in-court identification by John Paul Jones, the prosecution probably would have been able to establish by clear and convincing evidence that the identification was not tainted by the illegal lineup.

In 2008, Petitioner filed a pretrial motion to suppress the in-court identifications by Vernon Cox and John Paul Jones unless the prosecution proved the identifications had an origin independent of the illegal live lineup. At the hearing on the motion, defense counsel argued that the trial court was bound by this Court's finding that the prosecution could not establish that the identification by Vernon Cox had an origin independent of the illegal lineup. The trial court rejected this contention, in part because there had been no evidentiary hearing on independent origin either at Petitioner's original trial or before this Court on habeas corpus. The trial court

concluded that the only issue actually decided by this Court on habeas review was whether Petitioner had been prejudiced at his first trial by the violations of his Sixth Amendment rights. Accordingly, the trial court ordered an evidentiary hearing to allow the prosecution to attempt to establish an independent origin for the in-court identifications of Petitioner by Vernon Cox and John Paul Jones. After hearing testimony from Cox, John Paul and Petitioner, the trial court denied Petitioner's motion and ruled that the prosecution had established by clear and convincing evidence that the identifications of Petitioner as the shooter by both Cox and John Paul had an origin independent of the illegal lineup.

### 1. Collateral Estoppel and Law of the Case

The California Court of Appeal rejected Petitioner's contention that the doctrines of collateral estoppel and law of the case prevented the trial court from admitting into evidence the in-court identifications by Vernon Cox and John Paul Jones:

> Petitioner's arguments based on the doctrines of collateral estoppel and law-of-the-case both fail for the same reason: the issue determined by the trial court in this case with respect to the admissibility of Cox's in-court identification was *not* the same issue previously determined by the district court. The issue resolved by the district court was whether Petitioner was prejudiced by his trial counsel's failure to move to suppress Cox's in-court identification—that is, whether it was reasonably probable, *based on the record of the first trial,* that Petitioner would have received a more favorable result had his trial counsel made a motion to suppress. The district court did not hold an evidentiary hearing, and it received no testimony from Cox. Instead, the district court examined Cox's *trial* testimony to determine whether there was "a *reasonable*

*probability* that the prosecution *would have been unable* to establish by clear-and-convincing evidence that the in-court identification by Cox was independent of the illegal lineup." (Italics added.) In other words, the district court examined a trial transcript in an effort to ascertain what probably would have happened at a hypothetical suppression hearing, at which the evidence presented was identical to Cox's trial testimony....

> In contrast ... [t]he issue before the trial court was the factual determination of whether, based on the evidence presented at a suppression hearing, there was clear and convincing evidence that Cox's identification of Petitioner as the shooter had an origin independent of the illegal live lineup. The trial court held an evidentiary hearing and received testimony from Cox regarding the basis for his identification.

> Furthermore, ... it appears the evidence at the suppression hearing differed in material respects from the trial testimony relied upon by the district court. For example, unlike the trial court in this case, the district court had no opportunity to observe Cox testify or to evaluate his credibility. Based on its review of the trial transcripts, the district court thought it significant that Cox had little time to observe the shooter because Whitson picked the shooter up close to the scene of the shooting; the shooter was wearing a hat; Cox was intoxicated at the time of the shooting; and Cox's pre-live lineup photo identification of Petitioner was equivocal based on Cox's statement that the photo looked "mostly like" Petitioner. Cox testified at the suppression hearing, however, that notwithstanding his intoxication, he was alert when Whitson stopped the Jeep to pick up Petitioner. Whitson spoke with Petitioner "for a

little while" before Petitioner got in the car; Cox observed Petitioner during that time and was able to see his face. Cox then watched Petitioner run to the house to get something, and Cox saw Petitioner when he came back to the car. From the front passenger seat of the Jeep, Cox saw Petitioner pulling himself back in through the rear driver's side window after Petitioner fired the shots that killed Mitchshalae and wounded the Jones siblings. Cox identified both Whitson and Petitioner from photo lineups prior to the illegal live lineup. Cox testified that he had identified Petitioner as the shooter at the first trial, and that his identification was not based on the illegal live lineup—his identification was based on his observations of Petitioner in court and because Petitioner was "the person that was in the car." When examined by the trial court, Cox explained that he told police he was not certain about the photographic identification because he was scared—he had heard about what happened to people who testified against someone accused of a drive-by shooting, and he "didn't want to be that individual."

(Lodgment D at 11–13.) (Emphasis in original.)

■ The California Court of Appeal reasonably determined that the doctrines of collateral estoppel and law of the case do not apply here. First, collateral estoppel, or issue preclusion, "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Santamaria v. Horsley*, 133 F.3d 1242, 1244–45 (9th Cir.1998) (citing *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970)). "Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a

court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" *Id.*

■ "The law of the case doctrine states that the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case. Under the doctrine, a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case. For the doctrine to apply, the issue in question must have been decided explicitly or by necessary implication in the previous disposition." *United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir.2007) (citing *Herrington v. County of Sonoma*, 12 F.3d 901, 904 (9th Cir.1993)).

■ Here, as reasonably determined by the court of appeal, the issues before this Court on habeas corpus and the trial court on retrial were different. The only issues actually decided by this Court were that, based upon the trial record, Petitioner's Sixth Amendment right to counsel had been violated because no attorney was present during the live lineup and Petitioner's trial counsel was ineffective in failing to object to introduction of the evidence of the identifications made at the lineup. In analyzing the prejudice prong of the ineffective assistance claim, this Court found only that there was "a reasonable probability that the prosecution would have been unable to establish by clear and convincing evidence that the in-court identification by Cox was independent of the illegal lineup." (Report and Recommendation filed February 20, 2007, at pp. 32–33). This Court did not explicitly find that there was no inde-

pendent basis for the in-court identifications.

On the other hand, the issue before the trial court on retrial was specifically whether there was an independent basis for the identification of Petitioner by Cox and John Paul apart from the tainted live lineup. After listening to and evaluating the evidence and credibility of witnesses, the Court found that an independent basis for the identifications had been established.

The legal and factual findings made by this Court and by the trial court were based upon different procedures and evidence. This Court's determination that Plaintiff's Sixth Amendment right to the effective assistance of counsel was violated was made solely upon the record of Petitioner's first trial, and was made without benefit of an evidentiary hearing. On the contrary, the trial court's determination that there was an independent basis for the eyewitness identifications was made after a hearing on Petitioner's motion to exclude the identifications. During this hearing, the prosecution had the chance to demonstrate that the identifications were independent of the illegal lineup, and the trial court had the opportunity to hear the testimony of Cox, John Paul and Petitioner, and to assess each witness's demeanor and credibility.

Accordingly, the court of appeal correctly concluded that the doctrines of collateral estoppel and law of the case did not prevent the trial court from determining that there was an independent basis for Cox's and John Paul's in-court identifications of Petitioner.

### 2. Independent Source

Petitioner contends that the trial court violated his constitutional rights by admitting the eyewitness identifications by Cox and John Paul because the evidence produced at the suppression hearing was insufficient to demonstrate that the identifi-

cations came from a source independent of the tainted lineup. (Pet. at 5; Mem. of P & A at 16–24.)

■ The United States Supreme Court has held that a post-indictment lineup is a critical stage in a criminal prosecution at which the Sixth Amendment entitles the accused to the presence of counsel. *Moore v. Illinois*, 434 U.S. 220, 224, 98 S.Ct. 458, 54 L.Ed.2d 424 (1977); *United States v. Wade*, 388 U.S. 218, 236–37, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *United States v. LaPierre*, 998 F.2d 1460, 1463 (9th Cir. 1993) (right to counsel "attaches to the period during which an accused is within sight of a potential identification witness"). When a live lineup violates a defendant's Sixth Amendment rights, evidence of identifications made at the lineup is subject to a per se exclusionary rule. *Wade*, 388 U.S. at 236–37, 87 S.Ct. 1926. However, a witness who participated in such a tainted lineup may still identify the defendant at trial if the prosecution establishes by clear and convincing evidence that the in-court identification had an origin independent of the lineup. *Id.* at 241, 87 S.Ct. 1926.

■ When determining whether the identification has an independent source, a court must consider the following factors: (1) the witness's opportunity to observe the alleged criminal act; (2) the existence of any discrepancy between any pre-lineup description and the defendant's actual description; (3) any identification prior to lineup of another person; (4) the identification by picture of the defendant prior to the lineup; (5) failure to identify the defendant on a prior occasion; and (6) the lapse of time between the alleged act and the lineup identification. *Id.*

■ Applying these six factors to the testimony given at the suppression hearing by Vernon Cox and John Paul Jones, the California Court of Appeal determined

that the identifications by both witnesses had an independent source apart from the illegal live lineup. (Lodgment D at 14–19.) This finding is neither objectively unreasonable nor an unreasonable determination of the facts in light of the evidence presented.

### a. Vernon Cox

There was substantial evidence presented at the hearing that Cox had sufficient opportunity to observe Petitioner at the time of the shootings. Cox testified at the suppression hearing that Whitson spoke with Petitioner for awhile before Petitioner got into the Jeep, during which time Cox was able to see Petitioner's face. Cox watched Petitioner run back to his house to get something, and he saw Petitioner when he got back in the car. From his position in the front passenger seat, Cox observed Petitioner pulling himself back in through the rear driver's side window after firing the gun. Cox also saw Petitioner after he got out of the Jeep. (RT at 645–48, 664.) Cox also testified that, although he had been intoxicated earlier in the day from marijuana and alcohol, he felt better after having vomited, and had not had anything to drink or smoke for 45 minutes before he left Rance Hill's apartment with Whitson. (RT at 643–44, 654–55.) He also testified that, despite being intoxicated, he was alert when Whitson stopped the Jeep to pick up Petitioner. Cox testified that the day of the shooting would be "burned in [his] mind" for "the rest of [his] life," and that 17 years after the shootings, he still would not "even get in a Jeep Cherokee." (RT at 668.)

There was no evidence of any discrepancy between Cox's pre-lineup identification of Petitioner and Petitioner's actual description. Cox consistently described Petitioner as being light-skinned and having a jheri curl hairstyle. Although there were some discrepancies between Cox's and John Paul's testimony regarding whether Petitioner was wearing a baseball cap and whether he was wearing a track suit or jacket, this does not affect the fact that Petitioner's basic description of Petitioner has remained consistent throughout each of his identifications of Petitioner.

There was no evidence that Cox identified any other person as the shooter prior to the live lineup. In fact, Cox identified Petitioner consistently from his first contact with police. The record shows that Cox identified Petitioner as the shooter from a photo lineup, at the live lineup, at the first trial, at the suppression hearing, and at the second trial.

The evidence shows that Cox identified Petitioner by picture prior to the live lineup. Petitioner argues that Cox's identification was uncertain because Cox said that the photo looked "mostly like defendant" and that he was not "100 percent sure." However, at the suppression hearing, Cox explained that he told the police that he was not certain about the photograph because he was scared. Cox testified that he had heard about what happened to people who testified against someone accused of a drive-by shooting, and he "didn't want to be that individual." (RT at 667.) The trial court found this explanation credible. The trial noted that it had observed Cox testify, asked him questions, and found his testimony credible. The trial court was satisfied that Cox truthfully answered that his apparent equivocation in identifying Petitioner's photograph in the photo lineup was not because he was uncertain, but because he was frightened. (Lodgment D at 14; RT at 689–90.)

There was not a lengthy lapse of time between the shooting and the lineup identification. Cox identified Petitioner at a photo lineup approximately two months after the shooting. Also, on October 23, 1991, three and a half months after the

shootings, Cox identified Petitioner at the live lineup.

Accordingly, based upon all of these factors, the trial court properly determined that the prosecution had established that Cox's identification of Petitioner had an origin independent of the tainted live lineup.

### b. John Paul Jones

There was substantial evidence presented at the suppression hearing that John Paul had sufficient opportunity to observe Petitioner at the time of the shootings. John Paul testified that it was daylight when the shootings occurred and that he had no problems with his eyesight. (RT at 609.) He saw the Jeep Cherokee as it turned left onto Carlton Avenue and proceeded slowly toward the house. (RT at 610–11.) He saw that the Cherokee had three occupants—a driver, a person in the passenger seat, and someone in the back. He testified that he got a "good look at the shooter" and that the shooter looked in his direction before he began shooting. (RT at 611–12.)

There was no evidence of any discrepancy between John Paul's pre-lineup identification of Petitioner and Petitioner's actual description. While still in the hospital, John Paul accurately described both Petitioner and Whitson to the police, and told police that he "was sure that [he] could identify the shooter and the driver." (RT at 613.) In fact, at the live lineup, John Paul not only identified Petitioner but accurately informed the police that Petitioner had cut his hair since the day of the shooting. (RT at 621–23.) He testified at the hearing that the faces of both men were "burned in [his] memory forever." (RT 613–19.) John Paul also testified that his in-court identification of Petitioner at the first trial was not because of the live lineup, but because Petitioner was the shooter. (RT at 624.)

Further, the evidence shows that John Paul identified both Whitson and Petitioner from photo lineups prior to the live lineup. In addition, there is no evidence that John Paul identified any person other than Petitioner as the shooter prior to the live lineup or that he had failed to identify Petitioner on any prior occasion.

Nor was there any great lapse of time between the shooting and the lineup. On July 9, 1991, just two days after the shooting, John Paul identified Petitioner from a six-pack photographic array while he was recuperating at the hospital. And on October 23, 1991, three and a half months after the shootings, John Paul identified Petitioner as the shooter at the live lineup.

The trial court also found that John Paul's testimony was both detailed and credible. Although his opportunity to view Petitioner at the time of the shooting was brief, the trial court believed John Paul's statement that his identification of Petitioner was based on what he observed on the day of the shooting.

Accordingly, the determination of the California Court of Appeal that there was an independent basis for the eyewitness identifications of Petitioner by Vernon Cox and John Paul Jones apart from the illegal live lineup was neither contrary to nor an unreasonable application of federal law, nor an unreasonable determination of the facts in light of the evidence presented. Petitioner is therefore not entitled to habeas relief on this claim.

### B. The Trial Court Did Not Violate Petitioner's Due Process Rights in Denying His Request for a Mistrial

■ Petitioner contends that the trial court violated his due process rights when it denied his request for a mistrial. (Pet. at 5; Mem. of P & A at 27–30.) For the reasons discussed below, the decision of

the California Court of Appeal rejecting this claim was neither contrary to nor an unreasonable application of federal law.

### 1. Factual Background

Prior to trial, the trial court ordered the parties to inform their witnesses that they were not to mention the live lineup or the prior trial. The trial court instructed the parties to refer to the first trial as a "hearing" or "proceeding." The prosecutor told the trial court that he had instructed the prosecution witnesses not to mention the live lineup.

During Petitioner's cross-examination of Vernon Cox,[2] Petitioner asked Cox if Cox had a weapon on the day of the crime. Cox testified that he did not. Petitioner then asked if Cox had been asked that question before and Cox answered that he probably had. Petitioner asked Cox what his testimony was and Cox answered that his testimony had been that he did not have a weapon. Petitioner then asked, apparently trying to impeach Cox, "Did somebody ever ask you—*at the prior trial*—was the question asked on the day of the shooting did you have a gun?" (Italics added.) Cox answered, "Yeah. I remember reading that and I told them no, I didn't have no gun." (RT at 1026.)

Later in the cross-examination, Petitioner asked Cox several questions about how he could identify Petitioner "15 years later." Cox stated, "Because you look the same. Only thing, you don't have no hair on your head. *When I identified you in the lineup,* your head was just like that." (RT at 1029.) (Italics added.)

Petitioner requested a mistrial, which the court denied. Petitioner moved to strike the testimony and the trial court granted the motion. Outside the presence of the jury, Petitioner renewed his motion

for a mistrial. The trial court again denied the motion, explaining that it was unlikely that the jury knew that Cox had referred to anything other than the photo lineup Cox had testified about. The trial court admonished Cox not to mention the lineup again and admonished Petitioner not to refer to the prior trial again. (RT at 1031–32.)

During the direct examination of John Paul Jones, the prosecutor asked him if he had identified Petitioner at a "prior hearing." John Paul answered that he had. The prosecutor asked, "That was in 1992?" John Paul answered, "Whatever day *the trial* was. I don't know exactly what year." (RT at 1243.) (Italics added.) Petitioner did not object or move for a mistrial.

During cross-examination, Petitioner sought to impeach John Paul by demonstrating that John Paul had testified to "extra details" in his description of the shooter that he had not mentioned in 1991. Petitioner asked John Paul, "You understand these proceedings *are a result of an identification issue,* right?" (RT at 1286) (Italics added.) The trial court sustained the prosecutor's objection to the question. Petitioner asked John Paul if his memory should have been fresher at the time of the incident than it was 17 years later, and John Paul agreed that it should. Petitioner asked, "How many times have you talked to the detectives in regards to this case over the years?" John Paul answered, "I just got a phone call last year, this year or last year. *I think you were going up for appeal or trying to get out* or whatever the situation is. I haven't talked to them at all. (RT at 1287.) (Italics added.) The trial court then asked Petitioner if he wanted the answer stricken but

---

**2.** As will be discussed below in greater detail, Petitioner opted to proceed pro per at his

retrial. Thus, he personally cross-examined the prosecution witnesses.

Petitioner declined. He then requested a mistrial, which was denied.

Outside the presence of the jury, Petitioner argued that John Paul's use of the word "appeal" had communicated to the jury that Petitioner had previously been convicted. The trial court cautioned Petitioner that he kept asking the same questions over and over, and that "one of the consequences of asking the same question over and over again is that witnesses say things differently." (RT at 1289.) The trial court explained, "[D]o we really think that this jury doesn't know that there were prior proceedings 17 years ago and something happened in the meantime? They probably know something happened but we are trying our darndest to not tell them what happened so the only way we can do that is to try to admonish witnesses not to mention certain things." John Paul had not been admonished regarding use of the word "appeal" because the issue had not come up and Petitioner had not requested such an admonition. The trial court stated, "If for a minute I thought that the prosecution was telling his witnesses to throw things out as you allege, then I'd grant your mistrial. There is not evidence to believe that." (RT at 1290–91.) The trial court denied Petitioner's motion for a mistrial.

### 2. Decision of the California Court of Appeal

The court of appeal rejected Petitioner's claim of error stating in pertinent part as follows:

> With respect to Vernon Cox's reference to the live lineup, we conclude the trial court did not abuse its discretion in denying Petitioner's request for a mistrial. Although Cox violated the court's admonition by referring to the lineup, there is no indication in the record that Petitioner suffered incurable prejudice. To the contrary, it is unlikely the jury knew to what lineup Cox referred. The

only lineup the jury was aware of involving Cox was the photo lineup. There was no evidence or discussion of the live lineup in the jury's presence.

In any event, the trial court struck Cox's testimony regarding ... the lineup ..., and later instructed the jury, "If I ordered testimony stricken from the record you must disregard it and must not consider that testimony for any purpose." As noted, we presume the jury followed the trial court's admonition.

The trial court properly denied Petitioner's request for a mistrial due to John Paul Jones's reference to an "appeal." Notwithstanding the trial court's best efforts, there can be little doubt the jury was aware that there had been a prior trial. The jury heard evidence, for example, that the crime occurred in July 1991, and that Petitioner was arrested for the crime only days later. Any reasonable juror would have deduced that there must be *some* reason that Petitioner was being tried for the crime nearly 17 years later, in March 2008. Indeed, it was Petitioner who first referred in the jury's presence to his prior trial, and it was Petitioner who asked John Paul in the jury's presence if he was aware that the present proceedings were the result of an "identification issue." Petitioner also failed to object to John Paul's reference to the first trial in his testimony prior to his mention of an "appeal." There is no reason to believe that Petitioner suffered an incurable prejudice from John Paul's fleeting reference to an "appeal." Moreover, Petitioner cannot complain because the statement was not stricken or the jury admonished, because Petitioner refused the trial court's offer to strike the testimony.

Here—even if we assume the jury surmised that John Paul's reference to an "appeal" implied that a prior jury had

convicted Petitioner of the charges in this case—John Paul's statement likely had little effect on the jury's assessment of Petitioner's credibility .... [Also,] the trial court instructed the jury that Petitioner was to be presumed innocent of the crimes charged in this case, and the fact that charges had been brought against Petitioner was not evidence that the charges were true. Moreover, Petitioner subsequently testified that he had no prior felony convictions. The trial court properly denied Petitioner's requests for a mistrial.

(Lodgment D at 28–30.) (Emphasis in original.)

### 3. Analysis

Petitioner relies in part upon *Estelle v. McGuire*, 502 U.S. 62, 70, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), for the proposition that the trial court violated his right to due process when it denied his motion for a mistrial after various references were made to the lineup and earlier trial. (Mem. of P & A at 30.) Due process guarantees "the fundamental elements of fairness in a criminal trial." *McGuire*, 502 U.S. at 70, 112 S.Ct. 475 (quoting *Spencer v. Texas*, 385 U.S. 554, 563–64, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967)). The *McGuire* Court cautioned, however, that "we 'have defined the category of infractions that violate "fundamental fairness" very narrowly.'" *Id.* at 73, 112 S.Ct. 475 (quoting *Dowling v. United States*, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)). "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Id.* (quotation and citation omitted).

In a similar situation, the Ninth Circuit held that a trial court's denial of a defendant's motion for a mistrial based upon a prosecution witness's discussion of certain improper hearsay evidence, did not undermine the "fundamental fairness" of the defendant's trial in violation of due process. *Hayes v. Ayers*, 632 F.3d 500, 514–15 (9th Cir.2011). The *Hayes* court noted that the court sustained an objection to the testimony and instructed the jury to disregard it. *Id.*

Here, as in *Hayes*, Petitioner has failed to identify any Supreme Court precedent which holds that a fleeting mention by a witness of a prior trial or lineup which is then "excluded by the trial court with an instruction to the jury to disregard it was nonetheless deemed prejudicial enough to undermine the fundamental fairness of a criminal trial." *Id.* at 515. Moreover, any potential prejudice to Petitioner was cured by the trial court's striking the testimony and instructing the jury to disregard it.

As the court of appeal correctly noted, it is probable that, even without mention of a prior trial or lineup, the jurors would have surmised that this was a retrial, given that 17 years had passed between the crime and the new trial in 2008. And, as noted by the court of appeal, it is not clear whether the jury even understood what the witnesses were referring to when they mentioned a "lineup" or an "appeal."

Regardless, any possible error in the jury hearing a few fleeting references to a prior trial or a lineup was harmless given the strong evidence at trial of Petitioner's guilt through the eyewitness testimony of Vernon Cox and John Paul Jones. *See Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (on collateral review, any error is harmless unless it had a "substantial and injurious effect" on the jury's verdict). Accordingly, Petitioner is not entitled to relief on this claim.

### C. Petitioner Has Failed to Show That the Prosecutor Knowingly Presented False Evidence

█ Petitioner contends that the prosecution violated his constitutional right to

due process by deliberately presenting false evidence at trial. More specifically, Petitioner claims that the prosecution knowingly allowed witness Vernon Cox to falsely testify that his prior conviction for forgery was only a misdemeanor, not a felony, and that the prosecution had a duty to correct this false testimony. Petitioner further argues that Cox's false claim that the forgery conviction was merely a misdemeanor had a prejudicial effect because the trial court instructed the jury that it could only consider a witness's prior felony convictions in evaluating his or her credibility, not a misdemeanor conviction. (Pet at 5; Mem. of P & A at 36–46.) For the reasons discussed below, this claim is without merit, and Petitioner is not entitled to habeas relief.

Prior to trial, the prosecution gave Petitioner's attorney a list of the prior convictions for various witnesses, including Vernon Cox. (*See* Exs. in Support of Amended Pet. at 113.) The list for Vernon Cox indicated that he had felony convictions for possession of marijuana with intent to distribute, cocaine possession, and forgery. (*Id.*) When asked by the prosecution during direct examination about his prior convictions, Cox stated that he had convictions for marijuana possession with intent to distribute, forgery, and cocaine possession. (RT at 959–960.) On cross-examination by Petitioner, Cox said that he had been convicted of crimes twice, but then stated, "Well, if you count misdemeanors, three times." (RT at 976.) When Petitioner further questioned Cox about the nature of his prior convictions, Cox stated that the marijuana and cocaine offenses were felony crimes, but claimed that the forgery conviction was merely a misdemeanor. (RT at 977.) Petitioner contends that the prosecutor knew that this statement was false and the failure to correct the falsity resulted in a due process violation.

A prosecutor's knowing presentation of false testimony is inconsistent with the rudimentary demands of justice. *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935). A due process violation occurs when a prosecutor fails to correct testimony he knows to be false, even when the falsehood in the testimony goes only to the witness's credibility. *See Giglio v. United States*, 405 U.S. 150, 153–54, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Moreover, suppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A new trial is not automatically required, however, when "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict [ ]." *Giglio*, 405 U.S. at 154, 92 S.Ct. 763 (internal quotation marks and citation omitted). The omitted evidence must be material, *see Brady*, 373 U.S. at 87, 83 S.Ct. 1194, and a new trial is required only if there is a reasonable likelihood that the false testimony could have affected the jury's judgment. *Giglio*, 405 U.S. at 154, 92 S.Ct. 763 (citations omitted).

Here, there is no support for Petitioner's claim that the prosecution knowingly and purposely failed to correct false evidence. As Petitioner himself acknowledges, the prosecution disclosed the evidence of Cox's convictions to the defense before trial. Further, during direct examination, the prosecution specifically questioned Cox about his prior convictions for possession of marijuana with intent to distribute, forgery, and cocaine possession. (RT at 959–60.) Petitioner's cross-examination of Cox was the first time that Cox stated that his forgery conviction was a misdemeanor and not a felony. (3RT at 977.) Further, Petitioner failed to attempt to impeach Cox or even question him further regarding Cox's

statement that the forgery conviction was merely a misdemeanor. (*Id.*) Thus, it is likely that the prosecutor simply forgot that Cox's conviction for forgery was allegedly a felony, rather than a misdemeanor, and therefore unwittingly failed to correct the misstatement by Cox.

In addition, Petitioner cannot show there is a reasonable likelihood that the false testimony affected the jury's judgment. *Giglio*, 405 U.S. at 154, 92 S.Ct. 763. Because the jury heard that Cox had two felony convictions for possession of marijuana with intent to distribute and cocaine possession, as well as the forgery conviction, it is not reasonably likely that the jury's verdict would have been different if it heard that Cox's conviction for forgery was a felony, rather than a misdemeanor. Even if the jury might conceivably have discounted Cox's testimony if it knew that the forgery conviction was a felony, in light of the other evidence, it cannot be said that the misclassification of the forgery conviction rendered the trial fundamentally unfair. Accordingly, Petitioner is not entitled to habeas relief on this claim.

### D. Petitioner's Sixth Amendment Right to Counsel Was Not Violated By the Trial Court's Refusal to Allow His Attorney to Act as Advisory Counsel

Petitioner contends that his Sixth Amendment right to counsel was violated when the trial court refused to allow his retained attorney to act as advisory co-counsel. (Pet. at 6; Mem. of P & A at 47–55.) For the reasons discussed below, the decision of the California Court of Appeal rejecting this claim was neither contrary to nor an unreasonable application of federal law.

#### 1. Factual Background

After state charges were re-filed in June 2007, Petitioner was represented by appointed counsel. In October 2007, Petitioner requested and was granted a continuance to permit him to obtain private counsel. A privately retained attorney appeared for Petitioner on October 22, 2007, but was then replaced by another privately retained attorney, William McKinney, on December 11, 2007.

On March 12, 2008, at the hearing on his motion to suppress the identification testimony of Cox and John Paul, Petitioner informed the trial court that he wanted to represent himself, pursuant to *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and that he wanted McKinney to act as co-counsel. Petitioner explained: "The reason I want to do that is I've been dealing with a lot of these issues for 16 years. I know the case law and everything." Petitioner stated that there were "going to be some admissibility issues ... and I could better present them and assist my counsel because he had been sick. He has had a heart attack and other things .... I understand the appellate law on the issues that should be presented ... as far as the in limine motion. The trial—I'm not going to say anything there. All I want to do is establish everything for the in limine motion."

The trial court denied Petitioner's request, stating that Petitioner could represent himself if he wished, but that McKinney could not act as co-counsel. The trial court stated that McKinney was free to remain in the courtroom, to observe the proceedings and to assist Petitioner in whatever capacity he and Petitioner agreed outside of the courtroom, but McKinney would not be permitted to sit at counsel table and act as co-counsel. Petitioner objected to the trial court's ruling. McKinney continued to represent Petitioner through jury selection and the pretrial hearing on Petitioner's motion to suppress the identification testimony.

On March 17, after jury selection and prior to opening statements, the trial court and counsel were discussing evidentiary issues. Petitioner interrupted the discussion, stating, "Hey, I'm relieving counsel right now. I'm going to go pro per." After a brief recess, McKinney explained that Petitioner had decided, against the advice of counsel, to represent himself. Petitioner disagreed with certain aspects of McKinney's trial strategy. McKinney said that Petitioner "ha[d] accused [him] of being in a conspiracy with the District Attorney's office [and others] to get [Petitioner] convicted...." Petitioner told the trial court that it seemed to him that McKinney was "trying to railroad [him] on some issues" because when they came to court "certain things [were] not being litigated or expressed." Petitioner stated that he did not need additional time to prepare because he was "ready to go," and implied that McKinney's decision making was suspect because McKinney recently had been ill. McKinney stated that he would assist Petitioner in coordinating expert witnesses.

The trial court held a brief hearing on Petitioner's competence to represent himself. During the hearing, Petitioner stated that he wanted to "make sure we have enough time to go through all the evidence, objections. Other than that, I'm ready to go." The trial court stated that it would grant Petitioner pro per status and give Petitioner an opportunity prior to opening statements the next morning to discuss the evidentiary issues and discovery with the prosecutor. Petitioner then would have one last opportunity to reconsider his decision to represent himself. Petitioner asked if the trial court could "give me pro per today and have him [McKinney] ordered back tomorrow for just a stand-by thing for the technical thing ...." The trial court denied Petitioner's request, but nevertheless ordered McKinney to be present the following morning to give an update on the defense witnesses. The following morning, Petitioner confirmed that he wished to represent himself. (Lodgment D at 19–20.)

## 2. Decision of the California Court of Appeal

The court of appeal rejected Petitioner's claim that the trial court violated his constitutional right to counsel when it refused his request to allow his attorney to assist him as advisory co-counsel. The court of appeal first determined that, contrary to Petitioner's contention, the record did not show that Petitioner ever requested that McKinney be permitted to act as co-counsel at trial. The court of appeal reasoned that Petitioner's first request to represent himself on March 12 was limited to the hearing on the motion to suppress the identification testimony of Vernon Cox and John Paul Jones. Similarly, on March 17, when Petitioner exercised his right to represent himself at trial because of his disagreement with McKinney's trial strategy, Petitioner did not specifically request that McKinney be permitted to act as co-counsel at trial, but rather only requested that the trial court order McKinney back "for just a stand-by thing" for a discussion of evidentiary and discovery issues that was to occur the following morning. The court of appeal concluded, "Although the trial court denied Petitioner's request to order McKinney to act as stand-by counsel for the hearing, the trial court nevertheless ordered McKinney to be present, and Petitioner was given an opportunity prior to the hearing to change his mind with respect to representing himself. There is no basis in the record to conclude that the trial court abused its discretion in handling Petitioner's request as it did." (Lodgment D at 22–23.)

The court of appeal went on to find that, even if Petitioner's statements could be construed as a request for McKinney to

act as co-counsel at trial, the trial court did not err in denying Petitioner's request:

> Contrary to Petitioner's assertion, the trial court did not prohibit McKinney from assisting Petitioner during the trial—rather, the trial court explained to Petitioner that, although McKinney could not sit at counsel table or participate in the proceedings, McKinney could remain in the courtroom, observe the trial and assist Petitioner in whatever manner Petitioner and McKinney agreed outside of the courtroom.
>
> Furthermore, the trial court reasonably could conclude that permitting McKinney to act as co-counsel would not "promote justice and judicial efficiency ...." Petitioner chose to exercise his right of self-representation because he disagreed with McKinney's trial strategy so vehemently that he interrupted a discussion between counsel and the trial court to announce that he was "relieving counsel right now." According to McKinney, Petitioner accused him of conspiring with the prosecutor to "get [Petitioner] convicted," and Petitioner told the trial court that McKinney was trying to "railroad" him and that McKinney's decision making had been compromised by his health problems. Under these circumstances, the trial court could reasonably conclude that shared representation between Petitioner and McKinney was likely to result in conflict and would disrupt and delay the proceedings.
>
> The trial court found that Petitioner was competent to represent himself and, as the trial court observed, Petitioner proved to be a capable and well-prepared advocate at trial .... The trial court did not err in refusing to permit McKinney to act as co-counsel.

(Lodgment D at 24–25.) (Internal citations omitted.)

### 3. Analysis

Petitioner cannot show that the decision of the court of appeal was either contrary to or an unreasonable application of Supreme Court precedent because the Supreme Court has never determined that there is a constitutional right to appointment of advisory counsel. Although the Supreme Court has recognized the efficacy of hybrid representation to aid pro se defendants and to protect the integrity of the trial process, see *Mayberry v. Pennsylvania*, 400 U.S. 455, 467–68, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), neither that Court nor the Ninth Circuit have ever held that a pro se defendant has a constitutional right to advisory counsel. *See United States v. Kienenberger*, 13 F.3d 1354, 1356 (9th Cir. 1994) ("A defendant does not have a constitutional right to 'hybrid' representation.") (citing *McKaskle v. Wiggins*, 465 U.S. 168, 183, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984)). Here, Petitioner remained free to choose between self-representation and representation by counsel. The failure of the trial court to give him a "hybrid" representation to which he was not legally entitled did not violate his Sixth Amendment right to counsel.

### E. Petitioner's Sixth Amendment Right to Counsel Was Not Violated By the Trial Court's Denial of His Request to Discharge Counsel on the Day of Sentencing

█ Petitioner contends that the trial court violated his rights to counsel and due process when it denied his request to discharge his attorney on the day of sentencing. (Pet. at 5; Mem. of P & A at 56–62.) Petitioner is not entitled to relief on this claim.

### 1. Factual Background

The jury reached its verdict on March 28, 2008. The trial court scheduled the

sentencing hearing for April 25, 2008. Petitioner appeared on that date, stated that he was preparing a motion for new trial with assistance from his "federal appeal attorney," and requested a 60 day continuance. The trial court continued the matter to June 27, 2008.

On June 23, 2008, attorney Ron White appeared for Petitioner, seeking to be appointed to represent Petitioner for purposes of his motion for new trial and/or sentencing. (1 CT 111.) The trial court set a hearing on the motion for the next morning. At that hearing, Petitioner told the trial court that he wanted counsel appointed, and the trial court appointed White as Petitioner's lawyer for all proceedings.[3] The trial court continued the matter to August 1, 2008. White subsequently requested and the trial court granted three additional continuances.

On December 3, 2008, the date set for a hearing on a new trial motion and sentencing, White informed the trial court that, due to an error by his staff, Petitioner's written motion for a new trial was still not finished. The trial court stated that another continuance would not be granted because White had been appointed five months earlier and already had been granted several continuances to prepare the motion. White said that he had not intended to request a continuance, rather, he wanted to inform the trial court that Petitioner had discharged him due to his failure to prepare the motion. The trial court denied Petitioner leave to discharge his attorney because Petitioner had voluntarily sought appointment of counsel, and had said then that he would not seek to

represent himself again. (5RT at 3603–05.)

White then orally argued Petitioner's motion for new trial. (5RT at 3606–14.) He raised several of the claims of error presented here, including: 1) the binding effect of this Court's supposed finding that there was no independent basis for the in-court identifications made by Cox and Jones, 2) the superior court's finding that there was an independent basis for the in-court identifications by Cox and Jones, and 3) Cox's reference to the unconstitutional lineup at trial. The trial court denied the motion, implicitly relying on its prior conclusions and stating that although Petitioner "did a fine job representing himself" at trial, the evidence of his guilt was "pretty overwhelming." (5RT at 3615.)

Later, right before the imposition of sentence, the following colloquy occurred:

*Mr. Yokely:* I have Mr. White to do my pre-trial motion, and everything. I don't think it's fair for me to have to go to court with him if he is not prepared. I told him I wanted to fire him. You said go on with the hearing. I was in pro per at first when I had the motion. I did not know he didn't have the motion. Now I am here ill-prepared and it's essential to my issues being preserved on the record. You put me on in the position to bar certain steps in my case. He's not the one who went through the transcripts. He turned the transcripts over to a paralegal, therefore, the issues in my case he doesn't know them. He has to quote a couple of the main issues. Whenever we have an underlying issues he's not privy to based

---

**3.** The minute order indicates that White was appointed to represent Petitioner. (1 CT 112.) However, other minute orders refer to White as "private counsel". (1 CT 113–116.) In his petition and memorandum, Petitioner refers to White as retained counsel. At the sentencing hearing, Petitioner states that he had retained White. (5 RT 3604–05.) All that is clear is that Petitioner chose White to represent him. It is unclear whether he was appointed or retained.

upon the fact he gave the motion to his paralegal. He knows what the basic issues, what the court knows. All my other issues they, goes out the windows. That is not my problem.

*The Court:* I understand. I know what these are, the ones I anticipated are relevant. If I was wrong on the issues—

*Mr. Yokely:* You know—

*The Court:* I understand. I already put on the record about the delays. We are not going to have any more delays for the purpose of—for no purpose. I am not going to get into a debate with you. So I understand your position. Anything else, Mr. White?

*Mr. Yokely:* I want to discharge Mr. White.

*The Court:* I understand. That is denied. It would only serve as a delay and you have been here eight months.

*Mr. Yokely:* I want to deny Mr. White, based on the fact he's paid counsel and paid counsel in the matter is ineffective in this case.

*The Court:* I understand. I don't need to hear from you any more. I am going to go ahead and sentence you. All of these things will be preserved on appeal.

(5RT at 3618–19.)

### 2. Decision of the California Court of Appeal

The court of appeal rejected Petitioner's claim that the trial court erred by refusing to permit Petitioner to discharge his attorney:

The trial court in this case did not abuse its discretion when it found that Petitioner's request to discharge his attorney was untimely. The verdicts in this case were returned in late March 2008. Nearly nine months later, Petitioner still had not filed his motion for a new trial. The trial court had continued the matter *five times* to accommodate Petitioner and his attorney, White. The trial court stated that it had warned Petitioner and White on at least two prior occasions that they "needed" to present the new trial motion. Moreover, the trial court reasonably could anticipate that permitting Petitioner to discharge White on the date of the hearing would cause further substantial delay.

Petitioner argues that his request was not untimely because he sought to discharge White "as soon as he found out about counsel's failure to file a new trial motion." This is incorrect. The record indicates that White previously had appeared on at least *three* hearing dates—August 1, September 10 and October 29, 2008—unprepared to proceed on the new trial motion. Petitioner was present in court with White on each of those hearing dates and had the opportunity to assess White's performance and discharge him if Petitioner was dissatisfied. Petitioner did not do so. Moreover, Petitioner could have, but did not, discharge White for not filing a written motion prior to the date of the hearing. It may be that White rendered ineffective assistance of counsel. That is a matter that can be raised in habeas corpus. But that does not affect the untimeliness of the request to discharge counsel. The trial court did not abuse its discretion in denying Petitioner leave to discharge White. Moreover, the trial court entertained Petitioner's oral application for new trial and heard argument before denying the motion.

(Lodgment D at 37–38) (Emphasis in original.)

### 3. Analysis

Petitioner raises a hodge podge of claims stemming from the trial court's refusal to discharge counsel. He contends that this decision denied Petitioner counsel

of his choice, denied Petitioner his right to counsel, and perhaps denied Petitioner the right to the effective assistance of counsel.

■ The Sixth Amendment right to counsel encompasses two distinct rights: a right to adequate representation and a right to choose one's own counsel. *United States v. Rivera–Corona,* 618 F.3d 976, 979 (9th Cir.2010). The adequate-representation right applies to all defendants and "focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic,* 466 U.S. 648, 657 n. 21, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). A defendant who can hire his own attorney has a different right, independent and distinct from the right to effective counsel, to be represented by the attorney *of his choice. See Rivera–Corona,* 618 F.3d at 979 (citing *United States v. Gonzalez–Lopez,* 548 U.S. 140, 147–48, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006)) (emphasis in original). However, the right to retained counsel of one's choice is not absolute. The Supreme Court has "recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness … and against the demands of its calendar." *Gonzalez–Lopez,* 548 U.S. at 152, 126 S.Ct. 2557 (citing *Wheat v. United States,* 486 U.S. 153, 159–60, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)). As such, trial courts retain the discretion to "make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." *Id.* In general, a defendant who can afford to hire counsel may have the counsel of his choice unless "the substitution would cause significant delay or inefficiency." *Rivera–Corona,* 618 F.3d at 979; *see also United States v. Ensign,* 491 F.3d 1109, 1115 (9th Cir.2007).

■ The Ninth Circuit has identified three factors a court should consider when deciding whether to permit a substitution of retained counsel: (1) whether the defendant had already retained new counsel; (2) whether current counsel was prepared and competent to proceed forward; and (3) the timing of defendant's request to continue. *Miller v. Blacketter,* 525 F.3d 890, 896–98 (9th Cir.2008). In *Miller,* the court denied a habeas corpus petition alleging a violation of the right to counsel where: (1) the petitioner requested the continuance the morning that trial was scheduled to begin; (2) the petitioner had not yet retained a lawyer; and (3) his appointed lawyer was prepared to represent him. *Id.*

The circumstances in *Miller are* similar to those in this case. First, there is no evidence in the record that Petitioner had retained new counsel at the time of his request to dismiss White. In fact, Petitioner never specifically sought to hire another attorney; he merely stated that he wanted to discharge White based upon his contention that White was unprepared. Second, White was able to represent Petitioner, albeit ineloquently. However, the trial court was fully aware of the important issues in the case and invited oral argument on the motion before denying it.

Third, the trial court reasonably concluded that Petitioner's request to substitute counsel was untimely. Petitioner made his motion to terminate counsel on the day the motion for new trial was to be argued. As noted by the court of appeal, the trial court had granted five continuances in order to accommodate Petitioner and his attorney. Nearly nine months had passed since the jury's verdict in March 2008. The trial court stated that it had warned Petitioner and his attorney on at least two prior occasions that they needed to present the motion for new trial. Further, as the court of appeal noted, the trial court could reasonably anticipate that permitting Petitioner to discharge his attorney on the day of the hearing would cause further substantial delay.

■ "[U]nder the law of th[e] [Ninth] [C]ircuit, there is no automatic right to a substitution of counsel simply because the defendant informs the trial court that he is dissatisfied with appointed counsel's performance." *Jackson v. Ylst,* 921 F.2d 882, 888 (9th Cir.1990); *Hudson v. Rushen,* 686 F.2d 826, 832 (9th Cir.1982). Although Petitioner was fully aware that his attorney had not completed the motion for new trial on at least three prior occasions, nothing in the record indicates that Petitioner tried to retain new counsel at any time before the hearing date on December motion, and Petitioner does not attempt to justify the timing of his request. Accordingly, Petitioner has failed to show that he was denied the Sixth Amendment right to counsel of his choice.

It should be remembered that the California Court of Appeal framed this claim for relief as whether the trial court abused its discretion in denying Petitioner a continuance, rather than as a denial of the Sixth Amendment right to counsel of one's choice. Their finding that the denial of a continuance did not violate Petitioner's rights was objectively reasonable. The Supreme Court has held that "broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel." *Morris v. Slappy,* 461 U.S. 1, 11–12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). Here, the trial court acted well within its discretion in refusing to grant a continuance on the day that Petitioner's motion for new trial was to be argued, and after the motion had been delayed for nearly nine months due to Petitioner's repeated requests for continuances. Accordingly, the state court's denial of Petitioner's claim was not contrary to, nor an unreasonable application of, clearly established Supreme Court law.

In addition, Petitioner is not entitled to habeas corpus relief based upon any other alleged violations of his Sixth Amendment rights. Petitioner cannot claim that he was denied his right to counsel because he was in fact represented by an attorney, albeit an attorney with whose performance he was justifiably dissatisfied. Second, Petitioner has not alleged that his right to self-representation under *Faretta* was violated. Indeed, Petitioner never requested to proceed pro per at the December 3, 2008 hearing. Rather, the trial court only mentioned in passing that he would not allow Petitioner to represent himself again. (5RT at 3605.)

Finally, to the extent that Petitioner is alleging that counsel provided ineffective assistance of counsel by failing to file a written motion for new trial, that claim also fails. A claim for ineffective assistance of counsel requires a showing that (1) defense counsel's performance was unreasonable under prevailing professional standards, and (2) there is a reasonable probability that but for defense counsel's unprofessional errors, the result would have been different. *Strickland v. Washington,* 466 U.S. 668, 687–91, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Knowles v. Mirzayance,* 556 U.S. 111, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251 (2009).

■ Here, White argued the main issues supporting Petitioner's motion for new trial, including Petitioner's claims for relief presented here, claims that had been preserved for appeal and which have been consistently found to be without merit by the state courts and now by this Court. Further, even assuming that White's performance was deficient, Petitioner cannot demonstrate that, but for White's failure to file a *written* motion, there is a reasonable probability that the trial court would have granted his motion for new trial. Accordingly, Petitioner is not entitled to habeas

relief on any alleged violations of his Sixth Amendment rights.

## IV. Conclusion

For the reasons stated above, it is recommended that the petition for writ of habeas corpus be **DENIED.**

Dated: June 6, 2011.